UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : No. 23-CR-21 (CKK) |
| CHARLES F. MCGONIGAL, | : |
| Defendant. | : |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Charles McGonigal supervised national security operations for the Federal Bureau of Investigation ("FBI") in New York without disclosing to the FBI that he had taken hundreds of thousands of dollars from a businessman with ties to the Albanian government. Not only did he take the money – in cash – without disclosing it as required by law, but he also advanced the business interests of his benefactor and lied to the FBI about their joint activities. The defendant's concealment prevented the detection of the actual and apparent conflicts of interest between his official duties and his private financial interests. This is, at its core, corruption that undermines transparency and trust in the integrity of the Executive Branch of government. The defendant was sworn to investigate and prevent crimes against the United States, not perpetrate them. For his egregious violations of the public trust, the government requests that the Court sentence the defendant to 30 months' incarceration and order him to pay a fine of $95,000, a sentence at the top of, and consistent with, the applicable United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines").[1]

---

[1] On January 18, 2023, a grand jury sitting in the District of Columbia returned a nine-count Indictment charging the defendant with multiple counts of obstruction in violation of 18 U.S.C. § 1519; false statements in violation of 18 U.S.C. § 1001(a)(2), and concealment of material facts,

I.  **The Defendant's Criminal Conduct**

The defendant was a Special Agent in Charge ("SAC") of the FBI's New York Field Office ("FBI-NY") from October 2016 until his retirement in September 2018. In that position, he was responsible for overseeing counterintelligence and national security matters. ECF No. 32 (Statement of Offense) at ¶ 2. In the fall of 2017, while the defendant was employed as an SAC with the FBI-NY, he asked for and received approximately $225,000 in cash from an individual, identified herein as Person A. ECF No. 32 at ¶¶ 2, 16-17.

Person A was born in Albania, had worked for an Albanian intelligence agency in the 1980s and early 1990s. At the time he was introduced to the defendant, Person A was a naturalized U.S. citizen living in New Jersey. According to Person A, the defendant told him that he needed money because of financial pressures associated with his upcoming retirement and having college-age children, and that the money would be repaid. Person A anticipated that he would be going into a consulting business with the defendant after the defendant's retirement from the FBI and Person A believed that his relationship with the defendant would help him make potentially lucrative business connections in the future. For his part, the defendant agrees that he solicited the money from Person A with an eye towards a future business relationship with Person A, although upon his retirement, instead of working with Person A, he went to work for a commercial real estate company. Presentence Investigation Report ("PSR") ¶ 104.

The defendant failed to disclose the cash he received from Person A on annual public financial disclosure reports required pursuant to the Ethics in Government Act of 1978, forms known as Office of Government Ethics Form 278 ("OGE-278"). The purposes of the mandatory

---

in violation of 18 U.S.C. § 1001(a)(1). On September 22, 2023, after entering into a plea agreement with the United States, the defendant pleaded guilty to concealment of material facts, as charged in Count One. Sentencing is set for February 16, 2024.

2

disclosures on the OGE-278 were to: (a) foster transparency, trust, and confidence in the integrity and decision-making of the Executive Branch; and (b) assist government employees and their agencies in avoiding actual or apparent conflicts of interest between official duties and private financial interests or affiliations. Mandatory filers like the defendant were required to disclose assets, income, liabilities, gifts, and travel reimbursements. Twice, the defendant submitted OGE-278 forms (on June 10, 2018, and on May 6, 2019) that omitted any information about the cash received from Person A. ECF No. 32 at ¶¶ 33, 35.

Following his receipt of Person A's money, the defendant engaged in acts that concealed his relationship with Person A – and appeared to advance Albanian interests in the United States. For example, in the spring of 2018, several months after Person A provided the cash to the defendant, Person A was opened as an FBI-NY confidential human source for a criminal investigation within the defendant's area of responsibility; the investigation was also opened at the defendant's behest. The investigation involved allegations that an individual was violating the Foreign Agents Registration Act ("FARA") based on payment discrepancies associated with lobbying activities in the United States on behalf of an Albanian political party. The discrepancies were brought to the defendant's attention by Person A in collaboration with a former Albanian energy minister. At the time the matter was opened, FBI personnel questioned its propriety, and it was closed shortly after McGonigal's retirement as the allegations were never substantiated. *See* Exhibit 1.

The corrupt nature of the defendant's conduct is further illustrated by steps he took to advance Person A's financial interests. As the defendant admits, on September 7, 2017, he flew with Person A to Albania, where he met for several days with the same former Albanian energy minister and other foreign nationals. On September 9, 2017, in Albania, he met with both the

former energy minister and the Prime Minister of Albania. At Person A's request, the defendant cautioned the Prime Minister of Albania to avoid awarding oil field drilling licenses in Albania to Russian front companies at the very same time that Person A and the energy minister had a financial interest in the Government of Albania's decisions about awards of oil field drilling licenses. PSR ¶ 26.

The defendant took other actions that appeared to be at Person A's behest. In September 2017, in Albania, the defendant was introduced by Person A to an Albanian businessperson and politician who told the defendant that he wanted the United States government to investigate an alleged plot to kill that Albanian businessperson and politician. The defendant agreed to do his bidding, while also looking to line his and Person A's own pockets by seeking business opportunities with the Albanian businessperson.

Later that fall, on November 17, 2017, the defendant travelled by air to Austria. The next day, November 18, 2017, the defendant, in the presence of Person A and with another Department of Justice (DOJ) official, interviewed the same Albanian businessperson and politician that he had met during his September 2017 trip. Person A attended the meeting as an interpreter. The defendant did not prepare a standard FBI Form 302 report of the interview, and the FBI has no official record of the meeting taking place. Later that day, the defendant and Person A flew from Austria to Albania, where they met again with the same Albanian businessperson and politician, this time without the participation of the other DOJ official. At this meeting, the three men discussed business opportunities – including how they could all make money together in the pharmaceutical industry.

In addition to accurately completing the OGE-278 forms, the defendant had a duty, and was required by official FBI Policy Directives and FBI policy generally, to accurately report to the

FBI any official foreign travel, unofficial foreign travel, and any ongoing contacts with foreign nationals. The official and unofficial travel disclosures were required to be made on FBI Report of Foreign Travel Forms ("FD-772") and FBI Foreign Travel Debriefing Forms ("FD-772b"). The disclosures of contacts with foreign nationals were required to be made on FBI Report of Foreign Contact Forms ("FD-981"). Information provided on these forms had national security implications. Failure to complete them fulsomely or accurately could result in adverse employment actions including the revocation of security clearances when appropriate.

As the holder of a national security clearance, the defendant was required to report to the FBI accurate and complete information relating to his contacts with foreign officials and his financial assets and liabilities. Yet on two occasions (September 5, 2017, and November 15, 2017), the defendant submitted FBI Report of Travel forms containing false information relating to his connections with Person A and the former Albanian energy minister. The travel forms both related to the defendant's upcoming travel to Eastern Europe with Person A in September 2017 (prior to transfer of any cash but after the defendant had requested money from Person A) and November 2017 (after Person A provided at least some of the cash). Person A accompanied the defendant on both of these trips, but the defendant listed no "travel companions" on the forms.

The defendant also did not pay for his own lodging for portions of both of the trips, but he left blank the portions of the forms requiring information about any free lodging or accommodations. On both forms, the defendant disclosed the first destination of his foreign travels (Albania in September; Vienna, Austria in November) but failed to disclose that there would be a second country visited as well (Kosovo in September; Albania in November). The defendant met with the former Albanian energy minister on both trips (a foreign national with whom he had an

5

ongoing relationship since earlier that spring), but the defendant failed to identify any "reportable foreign contacts" as required by the FD-772.

On both forms, the defendant also falsely denied, or misleadingly characterized, the second destination on each of his travels. On the FD-772b form regarding the September trip (submitted on October 16, 2017) the defendant stated that he visited Kosovo only for sightseeing purposes on a non-official / tourist basis, and did not reveal that he had met with the incoming Prime Minister of Kosovo and provided FBI memorabilia to him. The FD-772b form for the November trip (submitted on January 22, 2018) failed to include that the defendant travelled from Vienna to Albania at all. On both FD-772b forms, the defendant denied having had contact with representatives of a foreign government outside of official FBI business, despite having met with the Prime Minister of Albania on both trips.

The defendant's surreptitious and corrupt foreign entanglement with Person A extended beyond Albania. In the spring of 2018, the defendant made efforts to facilitate a meeting between Bosnian individuals and the U.S. delegation to the United Nations, and suggested that the Bosnian individuals pay Person A for facilitating the very same meeting.[2]

Specifically, on April 27, 2018, the defendant met two individuals associated with a Bosnian pharmaceutical company in Germany. During this meeting, the individuals requested an opportunity to meet with the U.S. Ambassador to the United Nations or another high-level U.S.

---

[2] Although, this Bosnia-related conduct is not included in the defendant's statement of offense, this Court may consider it for sentencing purposes. In its evaluation, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, without regard to the rules of admissibility at trial. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (*citing Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

government official to request United States support for a political purpose that would impact the region of Bosnia and Herzegovina. On May 8, 2018, the defendant communicated with the FBI's liaison to the United Nations and requested assistance in arranging the meeting that the two individuals had requested. *See* Exhibit 2 at 1-2.

Approximately six weeks later, on June 25, 2018, the defendant proposed that Person A, through a corporate entity, enter into a contractual relationship with the Bosnian pharmaceutical company. *See* Exhibit 2 at 3. The defendant's proposal included that Person A's company would be paid $500,000 in exchange for the scheduling of a meeting between the pharmaceutical company and a representative from the U.S. delegation to the United Nations. On July 1, 2018, the defendant confirmed with Person A by electronic communication that he had proposed this contractual relationship above, and the defendant asked Person A to "protect [Defendant McGonigal's] name."

On July 26, 2018, the defendant provided to the FBI's liaison to the United Nations proposed dates for the meeting that the individuals associated with the pharmaceutical company had requested. The next month, on August 13, 2018, the defendant attended a meeting where he provided information to a senior official from the U.S. delegation to the United Nations about the request made for a meeting. The defendant did not at any point share information about Person A's financial interest in the meeting, or about the defendant's financial relationship with Person A. Ultimately, the meeting did not occur, and money did not exchange hands.

In sum, the defendant, a seasoned law enforcement officer, trained to detect the very crimes he was committing, over the course of multiple years, took cash from Person A and hid it from the FBI in violation of his duty to disclose the true nature of his relationship with Person A. In so

doing, he created an actual and apparent conflict of interest between his official FBI duties and his private interests, and betrayed the country he was sworn to serve.

## II.     The Applicable Sentencing Guidelines

To determine an appropriate sentence, the Court must first accurately calculate the defendant's advisory Sentencing Guidelines range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Given that the crime of conviction was 18 U.S.C. § 1001, the starting point for the Guidelines calculation is U.S.S.G. § 2B1.1; this is not in dispute. Section § 2B1.1 has a base offense level of 6, unless:

> (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (*e.g.*, 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct) …

U.S.S.G. § 2B1.1(c)(3). If these two conditions apply, then the Court should apply the guidelines governing the other offense established by the conduct set forth in the count of conviction. Here, both these conditions are plainly met.

First, it is undisputed that the defendant was convicted under 18 U.S.C. § 1001, a statute proscribing false statements or representations. Second, the conduct for which the defendant was convicted establishes a violation of 18 U.S.C. § 1519 (Destruction, alteration, or falsification of records in Federal investigations and bankruptcy), which is an offense specifically covered by another guidelines in Chapter Two, specifically § 2J1.2.

Section 1519 imposes criminal liability on anyone who "knowingly … conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1519. It applies to false

8

statements on "OGE-287" forms. *See e.g., United States v. Saffarinia*, 424 F. Supp. 3d 46, 80 (D.D.C. 2020) ("The Court concludes that the statutory text is broad enough to cover Mr. Saffarinia's alleged obstructive conduct [failure to disclose a loan], *see* 18 U.S.C. § 1519, and imposing a requirement that the matter develop into a formal investigation ignores the plain meaning of the statute…the plain language of § 1519 supports a broad interpretation of the words 'investigation' and 'matter'…") (internal quotations and citations omitted).

As set forth in paragraphs 47 and 49 of the PSR, as well as the Statement of Offense in support of his guilty plea, the defendant violated § 1519 each of the two times he submitted his OGE-278 forms without disclosing the loan he had received from Person A. Indeed, this offense was charged in the Indictment for conduct that was included in the Statement of Offense. *See* ECF No. 32 at ¶¶ 3, 16, 17, 33, and 35 and ECF No. 1 (Indictment) (Counts 8 and 9). And, importantly for these purposes, § 1519 is an offense specifically covered by another "guideline in Chapter Two" of the Sentencing Guidelines; it is covered by U.S.S.G. § 2J1.2. Accordingly, because the requirements of the cross reference in § 2B1.1(c)(3) are met, this Court should apply U.S.S.G. § 2J1.2, the Guideline governing § 1519 offenses to the defendant's offense. Thus, the correct Base Offense Level is 14. *See* U.S.S.G. § 2J1.2(a); *see also United States v. Hawkins*, 185 F. Supp. 3d 114, 118 (D.D.C. 2016) (considering both the charging document and the Statement of Offense and applying the obstruction of justice guideline to § 1001 conviction).

But this not where the inquiry ends. A three-level increase is appropriate under § 2J1.2(b)(2) because the defendant's offense involved substantial interference with the administration of justice, which is defined as "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or

court resources." § 2J1.2(b)(2). The defendant pleaded guilty to concealing from the FBI the true nature of his relationship with Person A. He admitted to, among other things, speaking with a foreign official about a matter in which Person A had a financial interest, and opening a criminal investigation based on information provided to him by Person A, all without disclosing to the U.S. Government that he had received hundreds of thousands of dollars from Person A. *See e.g.,* ECF No. 32 at ¶¶ 12, 28-30. FBI officials even questioned the propriety of opening up the criminal investigation at the time it was initiated, but cited the defendant's directive. *See* Ex. 1 at 1. Courts have applied the increase under § 2J1.2(b)(2) for analogous conduct, such as improperly influencing the trajectory of a criminal investigation. *See, e.g., United States v. Baker*, 82 F.3d 273 (8th Cir. 1996) (applying a three-level increase for substantial interference with the administration of justice under U.S.S.G. § 2J1.2(b)(2), where a police officer improperly terminated a felony investigation). Here, initiating the investigation based on Person A's information was particularly egregious given its lack of substantiation, which is why it was promptly closed following the defendant's retirement.

Moreover, given the defendant's senior and sensitive role in the organization, the FBI has been forced to undertake substantial reviews of numerous other investigations to insure that none were compromised during the defendant's tenure as an FBI special agent and supervisory special agent. The defendant worked on some of the most sensitive and significant matters handled by the FBI. PSR ¶¶ 98-101. His lack of credibility, as revealed by his conduct underlying his offense of conviction, could jeopardize them all. The resulting internal review has been a large undertaking, requiring an unnecessary expenditure of substantial governmental resources. This, too, supports the three-level increase. *See, e.g., United States v. Jackson*, 67 F.3d 1359, 1369-70 (8th Cir. 1995) (Noting that "the application notes to § 2J1.2(b)(2) define 'substantial interference with the

administration of justice' to include 'the unnecessary expenditure of substantial governmental or court resources'"). The increase is particularly warranted when, as here, there is a direct causal link between the defendant's crimes and the government's need for investigation. *Id; see also United States v. Wright*, No. CR 21-341 (CKK), 2023 WL 2387816, at *12 (D.D.C. Mar. 4, 2023) ("[T]he Government need only show a general causal tie between the defendant's actions and the otherwise unnecessary expenditure.").

Finally, as correctly noted in the Presentence Report and agreed to by the parties in the plea agreement, an additional two-level increase is appropriate because of the defendant's abuse of a position of public trust. This results in an offense level of 19 before any adjustment for acceptance of responsibility. The government agrees that the defendant has taken full responsibility for his conduct, resulting in a final adjusted offense level of 16.

For these reasons, the government and United States Probation Officer agree on the following Sentencing Guidelines Calculation:

Base Offense Level (Concealment Scheme)
(U.S.S.G §2J1.2, applying U.S.S.G. § 2B1.1(c)(3) cross reference):          14

Specific Offense Characteristics
Substantial Interference with Justice, U.S.S.G § 2J1.2(b)(2) :              +3

Adjustments
Abuse of Position of Trust, U.S.S.G § 3B1.3:                                +2
Acceptance of Responsibility, U.S.S.G. § 3E1.1(a) and (b)3:                 -3

Adjusted Offense Level                                                      =16

At Offense Level 16, given his Criminal History Category of II based on his prior conviction (discussed below) the defendant faces a Sentencing Guidelines-compliant sentence of 24 to 30 months' imprisonment, and a fine of $10,000 to $95,000.

On December 14, 2023, in the Southern District of New York, the defendant was sentenced to 50 months' incarceration for conspiring to violate U.S. sanctions pertaining to Russia, a crime he pleaded guilty to in August 2023. For this reason, he does not qualify for the zero-point offender reduction under U.S.S.G. § 4C1.1. Appropriately so: the defendant is not a first-time offender and has committed multiple felonies over multiple years. PSR ¶ 66.

### III. The Appropriate Sentence Considering the Section 3553(a) Factors

To determine an appropriate sentence, after the Court accurately calculates the defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. 38 at 49-50 (2007). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3553(a). The United States submits that considering these factors, a sentence of 30 months' incarceration and the maximum fine at Offense Level 16 are appropriate and not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

#### a. The Nature and Circumstances of the Offense Support the Top of a Guidelines-Compliant Sentence.

First, the nature and circumstances of the offense support the maximum Guidelines-compliant sentence. The defendant took great pains to abuse the public trust, conceal his conduct, and line his own pockets, multiple times. Abusing the public trust is particularly egregious when, as here, the motivation was pure greed and the defendant is a law enforcement officer charged with enforcing the very same laws he flagrantly violated. The disclosure requirements at which the defendant thumbed his nose prevent both corruption and the appearance of impropriety and are crucial to the integrity of federal law enforcement – and were especially important in a position as sensitive as the one he held. While the defendant claims not to have understood the severity of his

crimes, PSR ¶ 54, his long career investigating and overseeing counterintelligence belies such a claim of naivete.

### b. The History and Characteristics of the Defendant Support a Significant Sentence.

The defendant retired from the FBI's senior ranks and held one of its most important national security positions. At exactly the same time he was supervising his fellow law enforcement officers, the defendant was concealing from his colleagues and the public the fact that he had taken hundreds of thousands of dollars in cash from a former foreign official. The second factor that the Court must consider in fashioning an appropriate sentence is the history and characteristics of the defendant. Here, the history and characteristics of the defendant support a sentence at the top of the applicable Guidelines range. It is precisely because the defendant was one of the highest-ranking federal law enforcement officers in the United States that his conduct was so outrageous.

Moreover, the portrait of the defendant set forth in the Presentence Report is not one that excuses his senseless greed, nor provides a reason to depart from the Guidelines recommendations. He had a stable upbringing, a loving and supportive family, and does not appear to have any significant financial stress. PSR ¶¶ 78, 104. As an FBI agent, however, he knew exactly the risk he faced when he took money from Person A and the obligations derived from taking the cash. He concealed his conduct from the public and now must live with the consequences.

The Court should also consider the fact that the defendant is a repeat offender.

In 2014, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property of individuals determined by the U.S. Department of the Treasury to be responsible for or complicit in actions or policies that threatened the security, sovereignty, or territorial

13

integrity of Ukraine, or who materially assist, sponsor, or provide support to individuals or entities engaging in such activities. Executive Order 13660 and regulations issued pursuant to it prohibit providing or receiving any funds, goods, or services by, to, from, or for the benefit of any person designated by the Treasury Department.

On April 6, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Oleg Deripaska as a Specially Designated National in connection with its finding that the actions of the Government of the Russian Federation with respect to Ukraine constitute an unusual and extraordinary threat to U.S. national security and foreign policy. According to the Treasury Department, Deripaska was sanctioned for having acted or purported to act on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation and for operating in the energy sector of the Russian Federation economy. The U.S. District Court for the District of Columbia affirmed the sanctions against Deripaska. It found, among other things, that OFAC's determination that Deripaska acted as an agent of Russian President Vladimir Putin was supported by the evidence.

As an FBI official, the defendant helped investigate Deripaska and other Russian oligarchs. As a SAC, he supervised investigations into sanctions violations. Yet at the same time, he began building a relationship with an agent of Deripaska, in the hopes of doing business with Deripaska after he retired from the FBI.

In 2021, the defendant conspired to provide services to Deripaska, in violation of U.S. sanctions imposed on Deripaska in 2018. Specifically, following his negotiations with Deripaska's agent, the defendant agreed to and did investigate a rival Russian oligarch in return for concealed payments from Deripaska. While negotiating and performing services for Deripaska, the defendant and the agent attempted to conceal Deripaska's involvement by, among other means, not directly

naming Deripaska in electronic communications, using shell companies as counterparties in the contract that outlined the services to be performed, using a forged signature on that contract, and using the same shell companies to send and receive payment from Deripaska. The defendant hoped to do millions of dollars in business with Deripaska, but the FBI agents from the same division the defendant used to lead foiled his scheme.

This conduct forms the basis for McGonigal's separate conviction in the Southern District of New York, and he has been already sentenced for this conduct. With respect to assessing the defendant's history and characteristics for this case, however, it is appropriate for the Court to consider all of the defendant's misdeeds because they show that he did not commit a single aberrant act, but rather engaged in a sustained pattern of crime for multiple years. *See Witte v. United States*, 515 U.S. 389, 403 (1995) (increasing sentence for instant crime based on prior crime for which defendant was separately sentenced does not violate double jeopardy clause).

### c. The Defendant's Sentence Must Reflect the Seriousness of the Offense and Promote the Rule of Law.

Given the seriousness of the defendant's crimes, the maximum Guidelines sentence is also necessary to promote the rule of law, to provide just punishment, and to provide adequate deterrence – both specific, and general. Although the defendant has taken responsibility for his conduct, the acts he took to advance Person A's interests while still employed by the FBI suggest he was compromised, and that post-FBI employment was not his only motivation. Given that he was so easily bought, and a repeat offender, and given that his conduct of conviction in the Southern District of New York post-dated the wrongful conduct underlying his conviction in this jurisdiction, a significant sentence is warranted to provide adequate specific deterrence—the defendant will not lose the confidential information or tradecraft he specialized in through his years with the FBI following his release from incarceration.

Moreover, the legislative history of Section 3553 documents Congress' emphasis on the importance of general deterrence in white collar crime. *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime"). At its root, the defendant's crime is one of deceit, and reflects the trademarks of fraud. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations omitted).

This is especially true in corruption cases. It is incumbent upon the Court to send a strong, clear message to the public – and to other would-be offenders – that such a violation of the public trust cannot and will not be tolerated. "[P]ublic officials are the 'prime candidates for general deterrence' because they 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) (citing *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018)). Deterring government officials from abusing their positions of service requires a sentence at the top of the Guidelines range.

Further, "[p]robationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class," *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008); accord *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir.2006). There should be no doubt for any other high-level law enforcement officials that making false statements, concealing conflicts of interests, and undermining the integrity of their agencies – all for the sake of greed – will be met with severe consequences.

## IV. Fine, Forfeiture and Restitution

Consistent with the Sentencing Guidelines, the government asks the Court to impose a fine of $95,000, which the defendant has ample resources to pay. PSR ¶¶ 105, 114. In determining the fine amount, the Court shall consider the cost of imprisonment, PSR ¶ 140, which, if the proposed sentence is imposed, would exceed the $95,000 fine sought by the government. 18 U.S.C. § 3572(a)(6).

"[T]he [Mandatory Victims Restitution Act or "MVRA"] requires the sentencing court to order restitution to the victims of defendants who are convicted of certain enumerated crimes," which include crimes involving fraud and deceit. *United States v. Smith*, 297 F. Supp. 2d 69, 71 (D.D.C. 2003); *see also* 18 U.S.C. § 3663A(a)(1) (stating that "court shall order" restitution). The defendant's crime was one of deceit, but, given the lack of a pecuniary victim, the government does not propose that the Court order restitution or forfeiture.

## V. Conclusion

For the reasons set forth above, this Court should sentence the defendant to a term of 30 months' imprisonment and impose a fine of $95,000.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:    */s/ Elizabeth Aloi*
        Elizabeth Aloi
        Stuart D. Allen
        D.C. Bar. 1015864 (Aloi)
        Assistant United States Attorneys
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 695-0610 (Aloi)
        Elizabeth.Aloi@usdoj.gov