**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:23-CR-00021-CKK** |
| | ) | |
| **CHARLES F. MCGONIGAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

We respectfully submit this memorandum on behalf of Charles McGonigal, who is scheduled to be sentenced on February 16, 2024.  On September 22, 2023, Mr. McGonigal pleaded guilty, pursuant to an agreement with the government, to a single count of violating Title 18, United States Code, Section 1001(a)(1) by omitting information from government travel forms and financial disclosure statements.  The charges arose from Mr. McGonigal's failure to provide complete information about the circumstances of international travel with his friend and business partner ("Person A"), as well as his omission of a $225,000 loan he received from Person A.  Omitting relevant information from government forms is serious and warrants a sentence consistent with but no greater than other sentences imposed in this District for single count violations of Section 1001.  In addition to the specific offense conduct, the Court should also consider Mr. McGonigal's extraordinary service to the United States over his 22 years in law enforcement[1] as well as the substantial sentence already imposed on him in the Southern District

---

[1] A classified five-page addendum to this submission, which relates to Mr. McGonigal's professional background, is being filed contemporaneously and served on the government via the Classified Information Security Officer.

of New York, in arriving at a sentence in this case that is sufficient but not greater than necessary to serve the ends of justice.

## I.    BACKGROUND

The government's pre-indictment investigations of Mr. McGonigal were overt and aggressive.  More than a year before his arrest, on November 21, 2021, FBI agents conducted a recorded, voluntary interview of Mr. McGonigal at Newark airport when he returned home from an overseas business trip.  While he was speaking to agents at the airport, another team of agents visited Mr. McGonigal's home in lower Manhattan and met with his wife.  Over the following year, Mr. McGonigal was aware of the ongoing investigation into his business dealings and remained in communication with the United States through his counsel.  As a result of the government's overt investigative steps, in January 2022, Mr. McGonigal was fired from his position at the prestigious international company where he served as global head of security.

On January 18, 2023, the U.S. Attorney's Office in the District of Columbia charged Mr. McGonigal with making false statements and omitting information from government forms. In an unusual step by the Department of Justice, at the same time, the U.S. Attorney's Office in the Southern District of New York charged Mr. McGonigal with violations of IEEPA and money laundering, referencing some of the same potential witnesses as those identified in the D.C. indictment.  On January 21, 2023, while returning to his home in Manhattan, the FBI took Mr. McGonigal into custody on the charges stemming from both offices.  Because the arrest was orchestrated to take place on a Saturday afternoon, Mr. McGonigal was detained at the Metropolitan Detention Center in Brooklyn until his arraignment on the following Monday.  The government did not seek detention at his initial appearance, suggesting that the circumstances of

his weekend arrest were intended to be punitive.  Mr. McGonigal has been fully compliant with the terms of his release since his arrest.

When the United States presented him with a reasonable plea offer during the discovery phase of this case, Mr. McGonigal swiftly agreed to accept responsibility for his actions.  In addition, he agreed to meet with representatives from seven different DOJ offices after his plea and provided truthful information to the government during a seven-hour interview session. Notwithstanding his swift acceptance of responsibility and efforts to mitigate any harm he may have caused, Mr. McGonigal has faced a wave of personal attacks, including from high profile public figures.  Even more distressingly, his wife, Pam, and their two children also have been the subjects of unwelcome attention.  Currently, Mr. McGonigal is devoting his time and energy to his family, which is, in his own words, a top priority in his life: "[a]t this point, I am more concerned about my wife Pamela and children. . . . I wish I could relieve their pain and burden instantly, but I know it will take the remainder of my life to do so, which I am fully prepared to do."  Statement of Charles McGonigal, **Exhibit A** (submitted to the United States Probation Officer for the District of Columbia on November 22, 2023).  In addition, on his own accord, Mr. McGonigal has sought counseling to further his rehabilitation in this regard, including for problems arising from his abuse of alcohol.  PSR ¶ 84.

Although Mr. McGonigal offered to resolve both cases simultaneously at his first plea proceeding in the Southern District of New York back in August, the United States Attorney in the District of Columbia flatly rejected that request and insisted on keeping the two cases in separate districts, on separate tracks.  Accordingly, on August 15, 2023, Mr. McGonigal first entered a plea to a superseding information in the New York case charging him with one count of conspiracy, in violation of 18 U.S.C. § 371.  Shortly thereafter, on September 22, 2023,

Mr. McGonigal entered a plea of guilty in this case to one count of violating 18 U.S.C. § 1001 for failing to disclose complete information on FBI travel and financial disclosure forms.

## II.      THE PRIOR SENTENCING PROCEEDING IN NEW YORK

For his plea to one count of violating Section 371 in the Southern District of New York, arising out of his agreement to conduct research that could benefit a Russian oligarch, which began and ended in 2021,[2] Mr. McGonigal faced an effective Guidelines range of 57–60 months' imprisonment.  According to the Sentencing Commission's data, the average sentence actually imposed in cases under the same Guidelines provision is 18 months.[3]  In light of his extraordinary service to the United States and in the context of other more serious cases, Mr. McGonigal asked the Court to consider a sentence far below the advisory Guidelines range.  He also urged the government and the Court to consider only the offense conduct in that case, and to leave for this Court the conduct that pertained to the D.C. case, especially in light of the Department's unusual decision to pursue separate cases in separate districts simultaneously and to refuse him the opportunity to resolve both matters in one proceeding.  Nevertheless, at the sentencing in New York on December 14, 2023, prosecutors in the Southern District relied in part on Mr. McGonigal's conduct in the D.C. case in seeking the statutory maximum sentence of 60

---

[2] The Superseding Information reads, in relevant part, "*From at least in or about the Spring of 2021, up to and including at least in or about November 2021*, in the Southern District of New York and elsewhere, Charles McGonigal . . . agreed . . . to commit . . . violations of the International Emergency Economic Powers Act . . . and money laundering." (emphasis added).

[3]      According to the U.S. Sentencing Commission's JSIN database, available at http://www.ussc.gov/guidelines/judiciary-sentencing-information:

> During the last five fiscal years (FY2018-2022), there were 5 defendants whose primary guideline was §2M5.1, with a Final Offense Level of 25 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 4 defendants (80%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 23 month(s) and the median length of imprisonment imposed was 21 month(s). For all 5 defendants in the cell, the average sentence imposed was 18 month(s) and the median sentence imposed was 19 month(s).

months' imprisonment, arguing that Mr. McGonigal's offense conduct began "as early as 2017" when "[h]e started using his title and his power to develop contacts he could later go into business with."[4]  Transcript of Sentencing Hearing, **Exhibit B**.

Judge Rearden granted the government's request to consider the prior conduct, noting that Mr. McGonigal's efforts while still with the FBI to "develop[ ] relationships that could financially enrich him after he left the FBI" were "very serious" and warranted a "significant punishment."[5] Mr. McGonigal thus was sentenced to a very substantial term of 50-months' imprisonment, $17,500 in forfeiture, and a $40,000 fine, all based in part on conduct that predated his offense conduct in New York, and which is at the heart of the matter before Your Honor.  He currently is scheduled to self-surrender to the Bureau of Prisons ("BOP") on March 18, 2024 after the BOP has made a designation for the facility at which he will serve his sentence.  Judge Rearden also appropriately recommended that Mr. McGonigal be designated to a facility in the northeast where he will have access to the RDAP program so he can continue working on managing problems arising from his abuse of alcohol.[6]

## III.    SENTENCING GUIDELINES CALCULATION

As an initial matter, the parties agree that Section 2B1.1 applies to offenses involving violations of 18 U.S.C. § 1001.  Under Section 2B1.1, Mr. McGonigal's base offense level is 6.

---

[4] Transcript of Sentencing Hearing, **Exhibit B**, p. 10.  Notably, the conduct at issue in the New York case began *after* Mr. McGonigal's retirement from the FBI.

[5] Transcript of Sentencing Hearing, **Exhibit B,** pp. 39–41 ("The gravity of Mr. McGonigal's conduct is exacerbated by the manner in which he carried it out. As the special agent in charge of the counterintelligence division of the New York FBI field office, Mr. McGonigal occupied what by all accounts is one of the highest-ranking, most important intelligence positions in the country. It was while serving in that role that Mr. McGonigal began a concerted yearslong effort to exploit the information, his skills, and the contacts he had cultivated for the purpose of developing relationships that could financially enrich him after he left the FBI. This culminated in work beginning in or around 2021 for Russian national Oleg Deripaska, in violation of sanctions the United States had imposed on Deripaska in 2018.")

[6] Transcript of Sentencing Hearing, **Exhibit B,** pp. 47–49.

After a two-level enhancement is applied for use of a "special skill" pursuant to Section 3B1.3, and a two-level reduction for timely acceptance of responsibility pursuant to Section 3E1.1, the total adjusted offense level is still 6.  Because Mr. McGonigal was sentenced to a 50-month term of imprisonment in the New York case and judgment has been entered, his criminal history category is II.  With a total adjusted offense level of 6 and criminal history category II, Mr. McGonigal's advisory Guidelines range is 1–7 months.

The government asserts, however, that the cross reference in Section 2B1.1(c)(3) applies because Mr. McGonigal was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally and the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline.  According to the government, because the statement of offense also arguably establishes a violation of 18 U.S.C. § 1519, which is covered by Section 2J1.2(a), Mr. McGonigal's base offense level would be 14.  Moreover, because Mr. McGonigal's offense resulted in "substantial interference" with the administration of justice, the government asserts that a three-level increase should be applied pursuant to Section 2J1.2(b)(2).  Combined with the two-level enhancement for use of a "special skill" pursuant to Section 3B1.3, and a three-level reduction for timely acceptance of responsibility pursuant to Section 3E1.1, the government argues that Mr. McGonigal's adjusted offense level is thus 16, and his advisory Guidelines range is 24–30 months.

Mr. McGonigal disagrees with the application of the cross reference in Section 2B1.1(c)(3), which would increase his base offense level to 14, as inconsistent with case precedent.  In *United States v. Clinesmith*, No. 1:20-cr-165 (D.D.C. 2020), the government did not seek and the sentencing court did not independently apply the cross reference to the obstruction Guideline at the sentencing of an FBI attorney who caused false information to be submitted to the

U.S. Foreign Intelligence Surveillance Court ("FISC") in an application for a Foreign Intelligence Surveillance Act ("FISA") warrant sought in connection with an active FBI investigation.  The government's position that false statements to the FISC during an active investigation *does not* warrant application of the cross reference while Mr. McGonigal's conduct *does* is perplexing. While Mr. McGonigal concedes that this Court in *United States v. Hawkins*, 185 F. Supp. 3d 114 (D.D.C. 2016) held that it may consider conduct in the statement of the offense, and the court in *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020) held that at the motion to dismiss phase Section 1519 is broad enough to cover false statements on OGE-278 forms, it is difficult to reconcile these cases with the *Clinesmith* court's more recent analysis.  In *Clinesmith*, the District Court declined to apply the obstruction cross reference in determining the applicable Guidelines range, and we respectfully request that this Court similarly decline to apply the cross reference to the facts at issue here.

Mr. McGonigal further disagrees with the application of Section 2J1.2(b)(2) resulting in a three-level enhancement for "substantial interference" with the administration of justice. According to the PSR, the enhancement is applied to Mr. McGonigal because he admitted to "speaking with a foreign official about a matter in which Person A had a financial interest, and opening a criminal investigation based on information provided to him by Person A."  PSR ¶ 57. While the enhancement is appropriately applied to the "premature or improper *termination* of a felony investigation," we are aware of no authority supporting its application to the *opening* of a felony investigation, as is the case here.[7]   As Special Agent in Charge ("SAC") of

---

[7] U.S.S.G. § 2J1.2 ("Substantial interference with the administration of justice" means "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."); *see e.g., United States v. Baker*, 82 F.3d 273 (8th Cir 1996) (applying enhancement to police officer who improperly terminated a felony investigation).

Counterintelligence for the New York Field Office, it was Mr. McGonigal's job to pass along information he received that could be indicative of criminal activity. Had Mr. McGonigal taken the alternative route and concealed or withheld the information he received from Person A concerning potential criminal activity in the United States, that would be troubling. Instead, he passed the tip and lead to the FBI, to be appropriately vetted by the Bureau and the U.S. Attorney's Office. Accordingly, the application of Section 2J1.2(b)(2) is unwarranted.

Moreover, regardless of whether the correct adjusted offense level is 6, 16 or somewhere in between, had this case been efficiently consolidated with the New York case as Mr. McGonigal requested, the D.C. count of conviction would have been disregarded pursuant to Section 3D1.4(c) in calculating Mr. McGonigal's total adjusted offense level. Section 3D1.4(c) directs the Court when grouping counts of conviction to "[d]isregard any Group that is 9 or more levels less serious than the Group with the highest offense level." For the New York count of conviction, Mr. McGonigal adjusted offense level was 25.[8] Accordingly, even with the highest possible adjusted offense level of 16 for the D.C. count of conviction, the D.C. count would have been disregarded as 9 levels less serious than the New York count of conviction. Further, had the cases been consolidated for sentencing, Mr. McGonigal's criminal history category would be category I, resulting in a total adjusted offense level of 25, and a Guidelines range of 57–71 months—the *same* Guidelines range that was adopted by the Court and applied to Mr. McGonigal in the Southern District of New York when it considered the totality of Mr. McGonigal's conduct.

In addition, as the Court well knows, the Guidelines range is merely a starting point and is not binding on the ultimate sentence imposed. *United States v. Booker*, 543 U.S. 220 (2005); *Gall*

---

[8] *See* Transcript of Sentencing Hearing, **Exhibit B**, p. 8–9 ("I have calculated an offense level of 25 and a criminal history category of I, yielding a guidelines range of 57 to 71 months.").

*v. United States*, 552 U.S. 38, 49 (2007) ("The Guidelines are the starting point and initial benchmark but are not the only consideration."); *United States v. Terrell*, 696 F.3d 1257, 1261 (D.C. Cir. 2012) ("[T]he court must evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in [18 U.S.C.] § 3553(a)."). Here, Mr. McGonigal understands that the Court must calculate and consider the Guidelines range, but respectfully requests that the Court exercise its broad discretion to impose a fair sentence under the unusual circumstances presented, mindful that the Guidelines may be of only limited value in assisting the Court on the facts presented.

## IV.    STATUTORY SENTENCING FACTORS

After calculating the applicable advisory Guidelines range, courts must consider the statutory sentencing factors to "impose a sentence sufficient, but not greater than necessary" to meet the ends of justice. 18 U.S.C. § 3553(a). In determining the ultimate sentence to be imposed, within the statutory range of zero to five years, Section 3553(a) requires the Court to consider, in pertinent part:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;
> (5) any pertinent [US Sentencing Commission] policy statement;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

In addition, just as the Court has discretion to impose a sentence below the Guidelines range, so too do courts have "discretion to select whether the sentence they impose will run concurrently or consecutively with respect to other sentences they impose, or that have been imposed in other proceedings." *Sester v. United States*, 566 U.S. 231, 236 (2012); U.S.S.G. § 5G1.3(d). Comment 4 to Section 5G1.3(d) provides that a court may impose a concurrent sentence so long as it is "reasonable" after consideration of the following factors:

(i) The factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
(ii) The type (e.g., determinate, indeterminate/probable) and length of the prior undischarged sentence;
(iii) The time served on the undischarged sentence and the time likely to be served before release;
(iv) The fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
(v) Any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

Here, analysis of the 3553(a) and 5G1.3(d) factors strongly supports the imposition of a sentence within or below the applicable advisory Guidelines range to run concurrently with the substantial sentence already imposed in the Southern District of New York, which took into account some of the same conduct that is at issue before Your Honor.

### A. Facts Relevant to 3553(a) Analysis

#### i. 3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant;

This case is about the omission of relevant information from standardized government travel and financial disclosure forms, which was done to conceal the fact that Mr. McGonigal had prematurely launched his business networking plan, including by obtaining a $225,000 loan, in the months before he retired from the FBI. While there is *no question* that the concealment of these facts from the FBI is a serious offense, context is critical to understanding why Mr. McGonigal

did what he did, and what fair inferences can be drawn from his behavior that are relevant to sentencing.   The government asks the Court to infer the most nefarious intentions from the agreed facts in the statement of the offense as well as its own suppositions that go beyond both the statement of the offense and PSR,[9] but Mr. McGonigal must be sentenced for *what he did*, and not what the government *speculates he might have done*.

In 2018, shortly before his intended retirement from the FBI, Mr. McGonigal planned to launch a security consulting business with Person A, a U.S. national and personal friend of Mr. McGonigal.   PSR ¶ 23.   In furtherance of this goal, while he was still with the FBI, Mr. McGonigal engaged in foreign travel with Person A to develop business relationships abroad and accepted $225,000 from Person A, intended as seed money for the company, in the form of a loan to be repaid in company proceeds.  PSR ¶¶ 30–31.  The consulting company was incorporated in Delaware by Person A in January 2018.  PSR ¶ 21.

Knowing that FBI policy prohibited him from engaging in personal business development efforts, Mr. McGonigal did not report the foreign trips and loan received from Person A on forms submitted in the normal course in the last year of his employment with the FBI and, notably, at the FBI's request, nine months *after* Mr. McGonigal retired.[10]

To weigh the seriousness of this offense against Mr. McGonigal's personal background, including his extensive work as a national security professional, the Court must carefully consider the totality of his circumstances.  *See Koon v. United States,* 518 U.S. 81, 113 ("It has been uniform

---

[9] *See* United States' Sentencing Memorandum, p. 3 ("the defendant engaged in acts that concealed his relationship with Person A – and ***appeared*** to advance Albanian interests in the United States"), p. 4 ("The defendant took other actions that ***appeared*** to be at Person A's behest."), p. 15 ("the acts he took to advance Person A's interests while still employed by the FBI ***suggest*** he was compromised") (emphasis added).

[10] The forms at issue are FBI Report of Foreign Travel Forms ("FD-772"), FBI Foreign Debriefing Forms ("FD-772b"), and Office of Government Ethics Forms 278 ("OGE-278").

and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual. . . ."); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done . . . it should be at the moment of his sentencing"). As set forth below and in the classified addendum to this submission, Mr. McGonigal's service to the United States has been truly extraordinary, and often at grave personal risk. *See United States v. Rita*, 551 U.S. 338, 364–65 (2007) (Stevens, J., concurring) (noting that a sentencing judge may consider public service under Section 3553(a)).

From humble beginnings, Mr. McGonigal went on to do truly remarkable things for the safety of our country. He was born and raised in Cleveland, Ohio, the eldest of four children. PSR ¶ 79. His father was a steel worker, and his mother a stay-at-home mom. PSR ¶ 75. He went to school, played baseball and football, vacationed with his family in Florida, and went to church on Sundays. PSR ¶ 90. After graduating from high school, Mr. McGonigal obtained a degree in finance from Kent State University and began work as an accountant for National Bank of Canada in New York City. PSR ¶¶ 91, 96. Shortly thereafter, he met his future wife Pam at a party. PSR ¶ 77. The two married in 1994 and raised two wonderful, college-educated children, with whom Mr. McGonigal maintains a very close relationship. *Id.*

In 1996, Mr. McGonigal joined the FBI. PSR ¶ 97. After completing Special Agent training in Quantico, Virginia, he was assigned to the New York Field Office. *Id.* During his service, many of his accomplishments were proudly trumpeted by the FBI, and rightly so.[11] For example, during his tenure in New York, he investigated a number of high-profile cases, including

---

[11] Press Release, FBI (Oct. 4, 2016), https://www.fbi.gov/news/press-releases/charles-mcgonigal-named-special-agent-in-charge-of-the-counterintelligence-division-for-the-new-york-field-office.

the TWA Flight 800 explosion, which tragically killed 230 people on a trip from JFK to Rome.[12] Mr. McGonigal was part of the eight-month investigation, which included 244 eyewitness interviews and over 2000 hours of work.[13]  In addition, in 1997, Mr. McGonigal was one of two FBI agents who, alongside local police officers, raided the  apartment of Gazi Ibrahim Abu Mezer and Lafi Khalil, who were plotting to bomb the New York City subway.  *Id.*  Following a harrowing forced entry of the premises, both defendants were apprehended and charged with terrorism offenses in the Eastern District of New York.[14]  *Id.*  Further investigation revealed pipe bombs and detailed plans for the attack.[15]  *Id.*  The lead defendant Abu Mezer was ultimately convicted and sentenced to life in prison.[16]  *Id.*

Mr. McGonigal also served as a member of the FBI's Rapid Deployment Team to Dar Es Salam to investigate the 1998 terrorist bombings of the U.S. Embassies in Tanzania and Kenya, which killed more than 220 people and wounded more than 4,500.[17]  The investigation— at the time, the largest deployment in FBI history—resulted in the indictment of more than 20 individuals involved in the attack, including Osama Bin Laden, seven of whom are now serving life

---

[12]  *A  Look  Back  ...  The  Crash  of  TWA  Flight  800*,  CIA  (Aug.  14,  2008), https://web.archive.org/web/2011080508185/https:/www.cia.gov/news-information/featured-story-archive/2008-featured-story-archive/crash-of-twa-flight-800.html.

[13]  The U.S. government ultimately concluded that the explosion was not caused by a terrorist attack. According to the CIA, "[h]ad the crash been the result of state-sponsored terrorism, it would have been considered an act of war." *Id.*

[14]  Joseph P. Fried, *Two Said to Plot Bombing In a Subway Are Indicted*, N.Y. TIMES (Aug, 30, 1997), https://www.nytimes.com/1997/08/30/nyregion/two-said-to-plot-bombing-in-a-subway-are-indicted.html.

[15]  *Id.*

[16]  Joseph P. Fried, *Palestinian Gets Life Sentence For Planning to Bomb Subway*, N.Y. TIMES (March 2, 1999),  https://www.nytimes.com/1999/03/02/nyregion/palestinian-gets-life-sentence-for-planning-to-bomb-subway.html.

[17]  FBI, *supra* note 11; *East African Embassy Bombings*, FBI, https://www.fbi.gov/history/famous-cases/east-african-embassy-bombings.

sentences.[18]  In addition, Mr. McGonigal was assigned to the New York Field Office during the infamous terrorist attacks on September 11, 2001.  After participating in the investigation of the September 11 attacks, Mr. McGonigal joined an investigative response squad that focused on international terrorist threats in the New York City area, at a time when the Bureau was engaged in a post-9/11 transformation from a "reactive, investigative-led model to a proactive, intelligence-driven one."[19]

In 2002, Mr. McGonigal was assigned to the FBI's Cleveland office.  *Id.*  There, he investigated the disappearance of 14-year-old Kristen Jackson in Wooster County, Ohio, which led to a five-day manhunt culminating in the arrest of Joel Yockey and his confession to a gruesome rape and murder.  *Id.*  Yockey was sentenced to life imprisonment.[20]  Afterwards, between 2002 and 2006, Mr. McGonigal served as a Supervisory Special Agent in the Counter-Espionage Section at FBI-Headquarters, as Chief of the Asia-Near East Counterintelligence Unit, and later as a field supervisor of a counter-espionage squad at the Washington Field Office.[21]  In these roles, he supervised a number of high-profile espionage and media leak investigations, including the investigation of former National Security Adviser Samuel "Sandy" Berger for the mishandling of highly classified material.[22]  *Id.*  The Berger investigation consisted of over

---

[18] *East African Embassy Bombings*, FBI, https://www.fbi.gov/history/famous-cases/east-african-embassy-bombings.

[19] *Remembering 9/11*, FBI (Sept. 9, 2016), https://www.fbi.gov/news/stories/remembering-911.

[20]  David Tell, *The Once and Future Offender*, WASH. EXAMINER (Dec. 9, 2002), https://www.washingtonexaminer.com/weekly-standard/the-once-and-future-offender.

[21] FBI, *supra* note 11.

[22] *Id.*

50 interviews, inspections of the breached facilities, review of thousands of pages of documents, and concluded with Berger's conviction.[23]

Mr. McGonigal later led the FBI's WikiLeaks Task Force investigating the release of over 200,000 classified documents to the WikiLeaks website—the largest in U.S. history—ultimately resulting in the 20-count conviction of Chelsea Manning for espionage and related charges.[24]  In 2014, he was promoted to Assistant Special Agent in Charge over the FBI Baltimore Field Office's cyber, counterintelligence, counterespionage, and counterproliferation programs.[25]   In 2016, Mr. McGonigal was promoted to Special Agent in Charge of Counterintelligence for the New York Field Office, one of the most important, preeminent counterintelligence positions in the world.[26] In that role, where he served until his retirement in 2018, he supervised, among other cases, the multi-year investigation of Huawei Technologies Co., Ltd. and its CFO Wanzhou Meng in connection with a scheme to defraud numerous global financial institutions concerning the company's business activities in Iran.  *Id.*  The investigation led to a multi-count indictment against the company and executives, for violations including the Racketeering Influenced and Corrupt Organization ("RICO") Act, which remains pending in the Eastern District of New York.[27]

---

[23] Letter from Acting Assistant Attorney General to Chairman Henry A. Waxman of the Committee on Oversight and Government Reform (Feb. 16, 2007), https://www.justsecurity.org/wp-content/uploads/2022/10/Deputy-AG-letter-in-response-to-Committee-report-February-16-2007.pdf.

[24] FBI, *supra* note 11; Julie Tate & Ernesto Londoño, *Judge finds Manning not guilty of aiding the enemy, guilty of espionage*, WASH. POST (July 30, 2013), https://www.washingtonpost.com/world/national-security/2013/07/29/e894a75c-f897-11e2-afc1-c850c6ee5af8_story.html.

[25] FBI, *supra* note 11.

[26] *Id.*

[27] Press Release, *Chinese Telecommunications Conglomerate Huawei and Subsidiaries Charged in Racketeering Conspiracy and Conspiracy to Steal Trade Secrets*, Office of Public Affairs (Feb. 13, 2020), https://www.justice.gov/opa/pr/chinese-telecommunications-conglomerate-huawei-and-subsidiaries-charged-racketeering.

When Mr. McGonigal retired in September 2018, the FBI rightly honored his more than 22 years of service.  After leaving government service, Mr. McGonigal entered the private sector as the head of global security for a prominent international corporation in Manhattan.  PSR ¶ 104. Even after retirement, he made a lasting positive impression on many with whom he worked.  A former agent describes Mr. McGonigal as "the best supervisor" he had in the FBI.  Letter of Tom Shaughnessy, **Exhibit C**. He describes what it was like working under Mr. McGonigal's leadership as follows:

> He was far and away the best supervisor I had in the FBI, maybe a factor of ten. Remarkable and extraordinary are the correct adjectives. . . . His squad was a safe and secure place to work sometimes impossible national security cases. . . . [he was] like an experienced older brother who knew his way around and took complete ownership of your professional success. Charlie was ambitious but believed that his success depended on your success.

*Id.*  Another former Special Agent recalls that Mr. McGonigal "always conducted himself with honesty, integrity, and professionalism," noting that, despite present circumstances, many of his mentees "still steadfastly support him citing the positive impact he had in their lives and careers." Letter of Thomas Donlon, **Exhibit D**; *see also* Letter of Thomas Fitzgerald, **Exhibit E** (describing Mr. McGonigal as a "hardworking, mission oriented, patriot").

Similarly, Mr. McGonigal finds support and appreciation in his personal community.  His neighbors and friends describe in great detail the selflessness, compassion, and generosity he often displays to those around him, particularly in times of need:

> Charlie has been a compassionate, caring, and steady friend and has always been willing to help when needed without hesitation. . . . [o]n countless occasions he has driven through several states to be present for family members in their time of need or to celebrate an achievement, he opened his home to family members when they needed a place to stay for extended periods of time, and was there to provide support when my husband and I suffered the loss of our baby.

Letter of Dana Debski, **Exhibit F**.  In addition, Mr. McGonigal's cousin-in-law details how

Mr. McGonigal's "generosity and kindness was absolutely critical" to her and her sons on the

"darkest day" of her life, when her husband was missing and the family feared the worst:

> My kids were home and I didn't know what to do, so I called Charlie. Charlie was
> at my house in less than an hour. He stayed with me, took the boys to get lunch,
> and had the Washington and Baltimore FBI offices put out a search. . . .  What
> Charlie did that day for me and my boys is impossible to understate how important
> it was to us. Please know I absolutely hate revisiting this memory, but I am doing
> it for Charlie. I write this through tears, but it is worth it to help give you a sense of
> the man he is.

Letter of Susan Shuback, **Exhibit G**.

Although his many responsibilities kept Mr. McGonigal traveling for much of his career,

his neighbors consistently describe him as an "important fixture" of the community.  Letter of John

Spain, **Exhibit H**.   Maryland neighbor and friend John Spain describes a time when

Mr. McGonigal organized an annual neighborhood softball tournament to raise money in honor of

a friend who died of cancer, and another time when he stepped up to coach Wednesday night swim

team when no one else would.   *See id.*   Christopher Debski, a neighbor and friend of

Mr. McGonigal in Ohio, notes his knack for encouraging others to give back to the community in

the same way he does:

> Canton Montessori [School] always needed volunteers for one thing or another, and
> Charlie made sure to help whenever he could. One time he enlisted me in a project
> to help paint all the classrooms. We showed up and worked hard, and the whole
> time Charlie genuinely enjoyed the work, engaged with school staff and other
> volunteers, and made us all feel good about the work that we did.

*See* Letter of Christopher Debski, **Exhibit I**; *see also* Letter of Lawrence Hirsh & Joan Melner,

**Exhibit J** (describing how Mr. McGonigal would "regularly help shovel snow from the street

when the snow plows were not there, and he would cut the grass of an elderly neighbor without

being prompted"); Letter of Viktorya Evelkin, **Exhibit K** (describing Mr. McGonigal's "constant

willingness to help others, going out of his way to provide emotional comfort or valuable advice when needed"); Letter of Anat Goldstein, **Exhibit L** ("His actions have always been selfless, always thinking of others before himself.").

At home, Mr. McGonigal "is and has always been a tremendous father," a sentiment echoed in numerous letters from friends and family.  Letter of Pamela McGonigal, **Exhibit M**; *see also* PSR ¶¶ 76, 78; Letter of Lawrence Hirsh & Joan Melner, **Exhibit J** ("As a dedicated and committed father Charlie made concerted efforts to be present in his kid[']s lives."); *See* Letter of Christopher Debski, **Exhibit I** (describing Mr. McGonigal as "family-oriented," and noting that the McGonigal family "genuinely loved the time they spent together"); Letter of Roberto Morgado Jr., **Exhibit N** ("His integrity and commitment to his family and his country are qualities that I hold in the highest regard.").  In addition to being a caring father to his own two children, he is also godfather to two boys, and a "role-model" to many others.  Letter of Dana Debski, **Exhibit F**; *see also* Letter of Susan Shuback, **Exhibit G**.

Moreover, after Mr. McGonigal entered his plea, on November 17, 2023, at the request of the United States, Mr. McGonigal met with seven components[28] of the Justice Department simultaneously in Manassas, Virginia, where he answered all questions presented to him on a wide variety of topics, including detailed discussions of his understanding of certain events, and his considered assessment of what the FBI can do to improve its compliance policies and practices to detect and deter improper conduct within the organization.  We have been informed that the United States found the information that Mr. McGonigal provided during the full-day interview to be truthful and, we presume, of some assistance given the length and detail of the discussions.

---

[28] The specific components represented are not listed here, out of respect for sensitivities related to their specific areas of responsibility, but that information is available upon request if it is material to Court's consideration.

Mr. McGonigal's efforts to assist the government are properly considered by this Court in imposing sentence. *See United States v. Motley*, 587 F.3d 1153, 1158 (D.C. Cir. 2009) ("a sentencing judge may now take a defendant's cooperation with authorities into account in crafting an appropriate sentence, even if the government declines to file a motion pursuant to § 5K1.1"); *United States v. Gardellini,* 545 F.3d 1089, 1095 (D.C. Cir. 2008) (finding, without reference to Section 5K1.1, that defendant's cooperation with authorities was "directly relevant to the § 3553(a) analysis").

Under guiding precedents, the facts set forth above alongside the truly *extraordinary* public service detailed in the classified sentencing addendum must be considered holistically with respect to the nature of his offense of conviction as part of determining a fair punishment in this case. The government appears to ignore *all* of the incredibly important work Mr. McGonigal performed on behalf of the United States, which is fundamentally unfair under 3553(a)(1). Furthermore, the government's assertion that Mr. McGonigal's "long career investigating and overseeing counterintelligence belies [his] claim of naivete" is without merit. Even absent his express statement of responsibility, Mr. McGonigal's timely acceptance of the plea and post-plea conduct makes clear that he fully understands the severity of his conduct and accepts responsibility for it.[29] *See* Statement of Charles McGonigal, **Exhibit A.**

### ii.    3553(a)(2): The need to avoid unwarranted sentence disparities;

In order to maintain consistency in sentencing, Section 3553(a)(2) requires the Court to consider the sentences imposed in factually similar cases. In the vast majority of 1001 cases involving false statements on OGE-278 or similar ethics disclosure forms, courts have consistently

---

[29] The government does not dispute Probation's determination that U.S.S.G. § 3E1.1 warrants a three-level reduction of Mr. McGonigal's offense level for acceptance of responsibility.

imposed sentences below the advisory Guidelines range, typically in the range of zero to six months.

*United States v. Saffarinia,* No. 19-cr-216 (D.D.C. 2019) is particularly instructive here. In that case, a senior law enforcement official—an Assistant Inspector General at the United States Department of Housing and Urban Development's Office of Inspector General—was convicted by a jury of seven counts of false statements in violation of 18 U.S.C. § 1001, for repeatedly failing to disclose over $170,000 in loans he received from a personal friend on OGE-278 forms. At the same time Mr. Saffarinia made the omissions, he also steered millions of dollars worth of governments contracts and disclosed confidential government information to his personal friend and source of the loan. Despite facing an advisory Guidelines range of 21–27 months due to the application of the obstruction guideline, U.S.S.G. § 2J1.2(a), Judge Cobb imposed a sentence of 12 months and 1 day imprisonment. In contrast to Mr. Saffarinia, Mr. McGonigal quickly accepted responsibility for a single count of false statements through his guilty plea, avoiding any further expenditure of government resources, including potential Classified Information Procedures Act ("CIPA") litigation. *See also United States v. Safavian*, No. 1:05-cr-0370-PLF (D.D.C.) (imposing a sentence of 12 months and 1 day against the Chief of Staff for the General Services Administration following jury verdict for three counts of false statements and one count of obstruction of justice, 18 U.S.C. § 1505, for concealing foreign travel-related gifts from three separate government agencies).

Similarly, in *United States v. Cisneros*, 66 F. Supp. 2d 38 (1999), Henry Cisneros, a former San Antonio mayor and Secretary of Housing and Urban Development, was charged with 21 felony counts including conspiracy, false statements, and obstruction of justice arising from his failure to report "hush-money" payments on his DOJ SF-86 form and in subsequent interviews

with agents.  Over three years later, Judge Sporkin accepted a plea to one count of misdemeanor false statements and imposed a $10,000 fine and **no probation or term of incarceration**, noting Mr. Cisnero's long and commendable career in public service:

> This case, at its core, concerns a unique defendant. . . . He spent a good part of his career as a public servant. He has performed every one of his public positions in commendable fashion. . . . There is no evidence in this case that Mr. Cisneros in any respect compromised any of his public responsibilities.

*Cisneros*, 66 F. Supp. 2d at 39–40.  Here, Mr. McGonigal dedicated over 20 years of his life to responsibly carrying out the duties of an FBI Special Agent, subjecting himself to extraordinary risk to his personal safety, and retiring at the prestigious rank of SAC of the Counterintelligence Division of the New York Field Office.  Moreover, as in *Cisneros*, there is no allegation or evidence of which we are aware that Mr. McGonigal failed, in substantial measure, to carry out his assigned duties during the vast majority of his distinguished career.  Other than in cases involving international terrorism—clearly inapposite here—we find no precedent for imposing a significant term of incarceration for making false statements on standardized government forms or similar conduct.  *Compare Cisneros*, No. 97-cr-0485 (D.D.C. 1997), *United States v. Olson*, No. 22-cr-00144 (D.D.C. 2022) (imposing **probation** against U.S. Ambassador to Pakistan for failure to report cash and other gifts from a prospective business partner on OGE-278 forms and in interviews with agents); *United States v. Clinesmith*, No. 1:20-cr-165 (D.D.C. 2020) (imposing **probation** against **FBI attorney** for false statements in application for a Foreign Intelligence Surveillance Act ("FISA") warrant); *United States v. Silva*, No. 1:16-cr-00069 (D.D.C. 2016) (imposing **probation** against DEA special agent for failure to report gifts received from friends who benefited from his efforts to revoke the visas of two Mexican citizens on OGE-278 form), *United States v. Lieb*, No. 1:10-cr-00144 (D.D.C. 2010) (imposing **probation** against Department of Defense employee for failure to disclose gifts he received from a company that was awarded

significant DOD contracts on OGE-278 form), *United States v. Verrusio*, No. 1:09-cr-64 (D.D.C. 2009) (imposing sentence of **one day's imprisonment** against Policy Director for the U.S. House of Representatives Committee on Transportation and Infrastructure for failure to disclose gifts on annual U.S. House of Representatives Financial Disclosure Statement), *United States v. Helman,* No. 2:16-cr-245 (D. Ariz. 2016) (imposing **probation** against senior executive with the Department of Veterans Affairs for failure to disclose gifts valued at nearly $20,000 from government contractor on OGE-278); *with United States v. Greene*, No. 14-cr-00230 (D.D.C. 2014) (imposing 24-month sentence against FBI contract linguist for failure to report an intention to travel to Turkey to marry a known member of the foreign terrorist organization ISIS on FD-772 form).

In sum, to avoid an unwarranted sentencing disparity, the Court should carefully consider the sentences imposed in other analogous cases that implicate Section 1001. In the body of Section 1001 cases, where, as here, the conduct was a violation of internal agency policies, the sentences imposed were far below the Guidelines, and in many cases noncustodial. Indeed, the government acknowledges that the express penalties contemplated and espoused for omission of information from these types of forms were "adverse employment actions," not incarceration.[30]

### iii.    3553(a)(3): the need for just punishment, deterrence, and public safety;

The Court also must consider the need for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; and (B) afford adequate deterrence to criminal conduct. As applied to Mr. McGonigal, these factors strongly favor a concurrent sentence within or below the advisory Guidelines range. First, given how closely the cases against Mr. McGonigal have been amplified in the media, the

---

[30] United States' Sentencing Memorandum, p. 5.

government's dual prosecutions and its aggressive treatment of Mr. McGonigal unquestionably promote respect for the law and serves as a stark deterrent to anyone tempted to follow Mr. McGonigal's path towards ruin.  Mr. McGonigal has been disrupted and deterred by the government's bringing of these cases and the treatment he immediately received upon his arrest. Indeed, he was deterred after the FBI first approached him in November 2021.

To the heart of the matter, Your Honor, just punishment has already been imposed upon Mr. McGonigal.  His fall from grace has been precipitous, having lost his job, his reputation and the peace of his family life, and he now faces the stark prospect of the 50-month sentence he is about to begin serving.  He must endure the lasting pain he has incurred to himself and his family. *See* Letter of Pamela McGonigal, **Exhibit K** ("I never knew or believed this level of hate, evil and outright lack of compassion for humanity existed until experiencing it first-hand. . . . This combined with Charlie's legal situation has only compounded the pain and emotional trauma we continue to endure as his situation unfolds").

Moreover, Judge Rearden made clear that she considered Mr. McGonigal's conduct in the D.C. case in imposing a substantial sentence in New York, a sentence that exceeded even the 42-month term recommended by the Probation Department, which did not take into account his mitigating classified background because the Probation Department was not permitted to review it due to the level of classification.[31]  Here, a consecutive sentence would amount to duplicative consideration of the same criminal conduct for which Mr. McGonigal will already serve a significant term of imprisonment and in any event would be greater than necessary to achieve the aims of justice.

---

[31] *See* Transcript of Sentencing Hearing, pp. 39–41.

This Court has broad discretion to tailor an appropriate sentence for Mr. McGonigal to run concurrently with the sentence imposed against him in the Southern District of New York. *See United States v. Gardellini*, 545 F.3d 1089, 1092 (D.C. Cir. 2008) ("the Supreme Court has emphasized the discretion of district courts to sentence within or outside the Guidelines"); *see also United States v. Brown*, 892 F.3d 385, 398–99 (D.C. Cir. 2018) ("In general, Congress affords the courts discretion in deciding whether to sentence defendants convicted of multiple crimes concurrently or consecutively."). The advisory Guidelines range is not binding on the Court and is but one of the many factors the Court must consider in determining a just and reasonable sentence. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curium). Indeed, district courts "may not presume that the Guidelines range is reasonable." *Id.* A district court need only find a "sufficiently compelling" reason to issue a sentence below the Guidelines range, in light of the individualized assessment under Section 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). Similarly, to impose a concurrent sentence, the Court need only find that it is a "reasonable punishment" in light of the 3553(a) factors, the length of previously imposed sentence, and any other relevant circumstances. *United States v. Miller*, 953 F.3d 804, 814 (D.C. Cir. 2020). When considered against the truly extraordinary service Mr. McGonigal provided to the United States throughout his distinguished 22-year career as a law enforcement and counterintelligence professional as well as the significant sentence imposed against him in the Southern District of New York, a concurrent sentence is fair.

Importantly, and somewhat inexplicably, Mr. McGonigal has been significantly prejudiced by the government's refusal to resolve the charges against him in a single proceeding. As discussed, had Mr. McGonigal been allowed to consolidate these cases for sentencing, his total adjusted offense level for the full range of conduct would be 25, and his criminal history category I,

resulting in a Guidelines range of 57–71 months.  *See* U.S.S.G. § 3D1.4(c).[32]  This is the *same* Guidelines range that was adopted by the Court and applied to Mr. McGonigal in the Southern District of New York.  Instead, the government denied Mr. McGonigal the benefit of consolidated proceedings, resulting in an effective Guidelines range potentially 24–30 months higher than would have otherwise been applied, and an unnecessary use of resources in having to proceed with these cases on separate but parallel tracks.

In light of the highly prejudicial effect that charging Mr. McGonigal simultaneously in two separate districts has had on his effective Guidelines range, as well as the significant custodial sentence already imposed against him in New York, a concurrent sentence within or below the advisory Guidelines range is "sufficient, but not greater than necessary."  Whether the Court adopts the government's aggressive theory of enhancements for obstruction of justice or applies the more conventional analysis to the single Section 1001 violation to which Mr. McGonigal has pleaded guilty, this Court need not impose consecutive time on top of the 50 months in order to satisfy the 3553(a) factors and serve the ends of justice.  Similarly, no additional fine is warranted—certainly not one at the top of the Guidelines—beyond the $40,000 already imposed, given his limited financial means and the fact that his family will rely heavily on his remaining savings during his incarceration.

## V.     CONCLUSION

For the reasons set forth above, we respectfully request that the Court impose a sentencing at or below the applicable advisory Guidelines range of 1–7 months, to run concurrently with the

---

[32] U.S.S.G. § 3D1.4(c) directs the Court when grouping counts of conviction to "[d]isregard any Group that is 9 or more levels less serious than the Group with the highest offense level."  Because the adjusted offense level for the New York conduct was 25, and the adjusted offense level for the conduct in this case is 6, or at most 16, the D.C. conduct would have been disregarded for purposes of calculating Mr. McGonigal's total adjusted offense level for the full range of conduct.

50-month sentence already imposed against Mr. McGonigal.  The government has not asked for a consecutive sentence, and such a sentence would be greater than necessary to achieve the goals of sentencing in this case.

Date:  January 9, 2024                         Respectfully submitted,

                                               /s/ Seth D. DuCharme
                                               Seth D. DuCharme (admitted *pro hac vice*)
                                               Meagan C. Maloney (admitted *pro hac vice*)
                                               Bracewell LLP
                                               31 W. 52nd Street
                                               Suite 1900
                                               New York, NY 10019
                                               (212) 508-6165
                                               seth.ducharme@bracewell.com

                                               **Counsel for Defendant**
                                               **Charles F. McGonigal**