# EXHIBIT B

NCEVMCGS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          23 Cr. 16 (JHR)

5  CHARLES McGONIGAL,

6            Defendant.                  Sentence

7  ------------------------------x

8                                        New York, N.Y.
                                         December 14, 2023
9                                        1:40 p.m.

10

   Before:
11
                     HON. JENNIFER H. REARDEN,
12
                                         District Judge
13

14                          APPEARANCES

15

   DAMIAN WILLIAMS,
16      United States Attorney for the
        Southern District of New York
17 HAGAN C. SCOTTEN
   REBECCA T. DELL
18 ROBERT B. SOBELMAN
        Assistant United States Attorneys
19
   BRACEWELL LLP
20      Attorneys for Defendant
   SETH D. DuCHARME
21 MEAGAN MALONEY

22 Also Present:  Christina Clark, DOJ-NSD
                  George Murphy, FBI
23                Christopher de Grandpre, Paralegal - USAO

24

25

NCEVMCGS

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record, starting with the government.

4          MR. SCOTTEN:  Good afternoon, your Honor.

5          Hagan Scotten for the government.

6          Also present at counsel table:  Rebecca Dell, an

7     assistant United States Attorney in this case; Christina Clark,

8     a trial attorney with the National Security Division; Robert

9     Sobelman, who is one of the chiefs of our public corruption

10    unit; Supervisory Special Agent George Murphy of the FBI; and

11    our paralegal Christopher de Grandpre.

12         THE COURT:  Hello, all.

13         MR. SCOTTEN:  Thank you, your Honor.

14         MR. DuCHARME:  For Mr. McGonigal, Seth DuCharme.  And

15    I'm joined today by my colleague Meagan Maloney.

16         Good afternoon.

17         THE COURT:  Good afternoon, everyone.

18         Please be seated.

19         THE DEPUTY CLERK:  I just ask that you guys please

20    speak into the mic for the overflow court.  Thank you.

21         THE COURT:  Why doesn't everyone remain seated today;

22    makes it easier to speak into the mic.

23         All right.  We are here today for sentencing in *United

24    States v. Charles McGonigal,* 23 CR 16.

25         On August 15th, 2023, Mr. McGonigal pleaded guilty

NCEVMCGS

1    pursuant to a plea agreement dated July 24th, 2023, to a

2    superseding information charging one count, in violation of

3    Title 18, United States Code, Section 371, of conspiring to

4    violate the International Emergency Economic Powers Act and to

5    commit money laundering.

6            In preparation to today's proceeding, I have received

7    and reviewed the probation office's presentence investigation

8    report dated November 6, 2023, including its recommendation and

9    addendum.  I may sometimes refer to that as the presentence

10   report or the PSR.

11           I have also reviewed the following submissions from

12   the parties:

13           The defendant's sentencing submission dated November

14   30th, 2023, including the attachments to that submission

15   consisting of letters from family members, friends, and former

16   colleagues, as well as a statement from Mr. McGonigal himself;

17   and a classified supplement to this submission concerning some

18   of Mr. McGonigal's work during his time at the FBI.

19           The government's sentencing submission dated December

20   7th, 2023, including the attachments consisting of a transcript

21   of the sentencing proceeding in another case; a printout of

22   messages between Mr. McGonigal and another individual;

23   summaries of interviews and other records prepared during the

24   investigation of Mr. McGonigal between 2020 and 2021; and a

25   photograph.

NCEVMCGS

1           Let me first confirm that the parties have received

2   and reviewed each of those submissions.

3           Mr. DuCharme?

4           MR. DuCHARME:  Yes, your Honor.

5           THE COURT:  Mr. Scotten?

6           MR. SCOTTEN:  Yes, your Honor.

7           THE COURT:  Are there any other submissions that were

8   made that I did not mention?

9           Mr. DuCharme?

10          MR. DuCHARME:  Not that I'm aware of.

11          THE COURT:  Mr. Scotten?

12          MR. SCOTTEN:  No, your Honor.

13          THE COURT:  I am aware that both parties asked to seal

14   certain portions of their submissions.

15          I'm going to start with Mr. Scotten.

16          The government asked to seal -- to file under seal the

17   interview reports which I believe are Exhibits C through G; is

18   that correct?

19          MR. SCOTTEN:  That is correct, your Honor.

20          THE COURT:  All right.

21          Mr. DuCharme, have you received copies of Exhibits C

22   through G?

23          MR. DuCHARME:  Yes, your Honor.

24          THE COURT:  Okay.

25          Do you have any objection to those exhibits being

NCEVMCGS

```
1    sealed?

2              MR. DuCHARME:  No, your Honor.

3              THE COURT:  All right.

4              Mr. Scotten, can you confirm that you have received an

5    unredacted copy of Mr. McGonigal's submission, and that you

6    were informed of and given access to the classified supplement?

7              MR. SCOTTEN:  Yes, that's true, your Honor.

8              THE COURT:  All right.

9              I have seen in footnote 11 of the government's

10   submission, there's a comment about Mr. McGonigal's sealing

11   request, which is noted.  But I just want to confirm that you

12   don't have any objection to that proposed redaction; correct?

13             MR. SCOTTEN:  No, we're not opposing it.  If

14   Mr. McGonigal wants it, we have no objection.

15             THE COURT:  All right.

16             I have reviewed the proposed redactions and partial

17   sealing of the parties' respective submissions.  And I find

18   that those redactions are justified and narrowly tailored for

19   the reasons that would justify sealing, so I approve the

20   redactions.  I will file the unredacted versions of the

21   parties' submissions under seal.  In the event of an appeal,

22   those submissions will be available to counsel without further

23   application to me.

24             Mr. Scotten, the PSR indicates that there are no

25   identifiable victims in this case for purposes of the Crime
```

NCEVMCGS

1   Victims Rights Act; correct?

2            MR. SCOTTEN:  That's correct, your Honor.  The only

3   victim here is the United States.

4            THE COURT:  I'm going to turn now to the presentence

5   report.

6            Mr. DuCharme, you have read the report; correct?

7            MR. DuCHARME:  Yes, your Honor.

8            THE COURT:  All right.

9            And you have discussed the report with your client?

10           MR. DuCHARME:  I have.

11           THE COURT:  Mr. McGonigal, you have read the

12  presentence report, yes?

13           THE DEFENDANT:  Yes, I have, your Honor.

14           THE COURT:  And you have discussed it with your

15  counsel, Mr. DuCharme?

16           THE DEFENDANT:  I have, your Honor.

17           THE COURT:  Have you had sufficient time and

18  opportunity to review the report and discuss it with

19  Mr. DuCharme?

20           THE DEFENDANT:  I have, your Honor.

21           THE COURT:  Have you been able to discuss with

22  Mr. DuCharme any errors that you might have seen in the report?

23           THE DEFENDANT:  There were no errors to -- you know,

24  under my review, your Honor.  So if there would have been, I

25  would have had those discussions.  We have not.

NCEVMCGS

1          THE COURT:  So you do not have any objections to the

2   contents of the presentence report; correct?  In other words,

3   you agree with the report's contents?

4          THE DEFENDANT:  I agree with the report's contents,

5   yes.

6          THE COURT:  Have you also spoken with Mr. DuCharme

7   about anything else that you wish him to take up with me today

8   at sentencing?

9          THE DEFENDANT:  There was nothing additional to take

10   up with you today, your Honor.

11          THE COURT:  Mr. Scotten, have you also reviewed the

12   presentence report?

13          MR. SCOTTEN:  I have, your Honor.

14          THE COURT:  All right.  Before I turn to calculation

15   of the sentencing guidelines, I want to give both parties a

16   chance to weigh in regarding the factual accuracy of the

17   report.

18          I am aware that the government submitted a response to

19   probation regarding the JSIN data, the information from the

20   JSIN database in Appendix A of the presentence report.  I'm

21   also aware that Mr. McGonigal provided what probation

22   characterized as minor comments to the draft PSR; and it

23   appears that all of those comments — there weren't very many —

24   were incorporated into the final report.

25          So putting aside those responses from the parties

NCEVMCGS

1    earlier in connection with the report, are there any objections

2    now to the factual accuracy of the PSR?

3                MR. DuCHARME:  None from Mr. McGonigal, your Honor.

4                MR. SCOTTEN:  Not from the government, your Honor.

5                THE COURT:  I will adopt the factual recitation set

6    forth in the presentence investigation report.  The PSR will be

7    made part of the record in this matter; it will be placed under

8    seal.  If an appeal is taken, counsel on appeal may have access

9    to the sealed report without further application to the Court.

10               I'm now going to turn to calculation of the sentencing

11   guidelines in this case.  I'm not bound by the guidelines, that

12   is to say they are advisory; but I do have to accurately

13   calculate the guidelines range and consider what the guidelines

14   recommend before imposing an appropriate sentence.

15               As an initial matter, I note that at the time the

16   parties entered into the plea agreement in July 2023, the

17   November 2021 guidelines controlled.  Having said that, as the

18   parties know, on November 1, 2023, certain amendments to the

19   guidelines went into effect.

20               I have determined — and I have no reason to believe

21   that the parties dispute this — that the November 2023

22   amendments do not alter the computation of Mr. McGonigal's

23   sentence from what it would have been under the November 2021

24   guidelines.  That is to say, I have calculated an offense level

25   of 25 and a criminal history category of I, yielding a

NCEVMCGS

1    guidelines range of 57 to 71 months.  That range is cabined by

2    a statutory maximum penalty of 60 months, which brings the

3    applicable range to 57 to 60 months.  For the avoidance of

4    doubt, I will note that the amended guidelines' two-level

5    offense reduction for zero point offenders does not apply here.

6             In the plea agreement, both parties agreed not to seek

7    a departure from the guidelines range; is that correct?

8             MR. SCOTTEN:  That's correct, your Honor.

9             THE COURT:  I have nevertheless considered whether

10   there is any basis for a departure and find that there are no

11   grounds justifying a departure here.

12            So with that, I would turn to counsel and then to

13   Mr. McGonigal, if he wishes to say anything.

14            I have read everyone's sentencing submissions, all of

15   which were thorough and thoughtful, so you need not repeat

16   anything that you have already shared with me.  That said, I'm

17   happy to hear anything anyone wants to tell me today.  And if

18   there's anything you think would be helpful, then this is your

19   opportunity to express it.

20            So let me start with you, Mr. Scotten.

21            MR. SCOTTEN:  Thank you, your Honor.

22            And I will take a little bit of time here.  I hope

23   it's not unduly repetitive.  I am going to try to get to a

24   focus on what I understand are the points in dispute.

25            But I do think, given the nature of the crime here,

NCEVMCGS

1    it's important to begin with where this began, which is in

2    2016, when Charles McGonigal became Special Agent in Charge of

3    the FBI's New York counterintelligence office.  And because of

4    New York's central place in international affairs, that job is,

5    as Mr. McGonigal acknowledges, one of the most important

6    counterintelligence espionage jobs or counterintelligence jobs

7    in the world.

8           Mr. McGonigal's appointment should have been — should

9    have been — the crowning achievement in a distinguished career

10   with the FBI; and it should also have been an opportunity for

11   him to use his considerable skills to serve his country.  But

12   McGonigal wasn't content with the honor of receiving that

13   position.  He was not content to earn over $200,000 a year in

14   that job or the all-but-guaranteed opportunity to earn more

15   upon retirement.  And most importantly, he was not content to

16   serve only the country that trusted him with one of its most

17   important counter-espionage jobs.

18          Instead, your Honor, as early as 2017, McGonigal began

19   abusing his position to set himself up for a lucrative future.

20   He started using his title and his power to develop contacts he

21   could later go into business with.  And not some new business

22   unrelated to his time at the FBI; he was not looking to set up

23   a restaurant or to have a second career in IT.  He was looking

24   to turn his credentials into cash, to find people who would pay

25   him for the special skills and knowledge the FBI had given him.

1          This Court is familiar with some of the people from

2    the partners he began scheming with:  Sergey Shestakov, a

3    former Russian diplomat and his co-defendant in this case; a

4    friend in Jersey who owned a consulting corporation called

5    Spectrum who gave McGonigal a phone number, an email address

6    under a false name so that Mr. McGonigal could hide the fact

7    that he was working with Spectrum, even while he was supposed

8    to be working only for the FBI.

9          But it is a third business partner who explained why

10   Mr. McGonigal is here today:  Yevgeniy Fokin, another former

11   Russian diplomat, who McGonigal said was still a Russian

12   intelligence officer.  What was really significant about Fokin

13   though, your Honor, was what everybody knew about him and what

14   I don't think Mr. McGonigal denies knowing, and that is who

15   Fokin's boss was:  Oleg Deripaska.

16         Your Honor, Deripaska is a notorious Russian oligarch;

17   a manpower who was powerful not only because of his vast

18   wealth, but because of his close connections to the Russian

19   state and to Vladimir Putin personally; a man who wields power

20   not only because of his bank account, but because he is willing

21   and able to use murder, threats, espionage, all the resources

22   that he has as one of Putin's most trusted henchmen.

23         And your Honor, no one knew better than McGonigal what

24   Deripaska represents.  McGonigal had supervised

25   counterintelligence operations against Russian agents for

NCEVMCGS

years.  He had been briefed about Deripaska.

         Mr. McGonigal knew that Deripaska was to be sanctioned
before Deripaska himself knew.  Yet in the spring and summer of
2018, which is the very same time United States was imposing
sanctions on Deripaska, McGonigal began cozying up to Fokin.
He got Fokin's daughter VIP treatment from the FBI and the
NYPD; it was treatment so unusual that an NYPD sergeant
reported it.  But McGonigal did not care about that.  He cared
about cultivating a business contact who could enrich him down
the line.

         At first, McGonigal tried to make that contact payoff
legally, when McGonigal received $25,000 from a law firm that
he connected Deripaska with.  But in 2021, he saw an
opportunity to make far more by breaking the law for Deripaska.
As this court knows, your Honor, that was the year McGonigal
agreed to work for Deripaska by investigating one of his
business rivals for an initial payment of $50,000, and about
$40,000 per month after that.  And as the Court read, in
McGonigal's own words, he was hoping for far more; he was
hoping to make millions in business with Deripaska.

         Before I talk about how serious that crime was, your
Honor, I want to mention briefly how unnecessary it was.

         When Charles McGonigal chose to commit his crimes, he
served as the head of what he's rightly called -- the head of
global security for what he's rightly called the prestigious

NCEVMCGS

1    international corporation.  His joint legal income was over

2    $850,000.  He had a Manhattan apartment, which he owned, and a

3    Mercedes.  In other words, your Honor, he was far, far better

4    off than most of the citizens he had sworn to protect at the

5    FBI.  Poverty did not motivate this crime, your Honor.  Greed

6    did.

7          And this was a grave crime, your Honor.  It was a

8    betrayal.  McGonigal learned what oligarchs are, what a threat

9    they pose to our country, and how to investigate them with the

10   FBI; and not just as an agent, your Honor, as one of the people

11   most entrusted with this country's secrets.  McGonigal then

12   turned those skills, that knowledge and his influence, against

13   the law that he had sworn to uphold, selling his loyalty to one

14   of those oligarchs.

15          Your Honor, I want to discuss three reasons why this

16   crime is serious and merits a serious punishment.

17          The first I don't think McGonigal disputes:  Sanctions

18   are important.  They play a critical role in protecting our

19   national interests, in particular, by allowing us to respond to

20   hostile actions without more costly measures, things like

21   breaking off diplomatic relations or even going to war.  And

22   the sanctions here are serving that purpose, your Honor.  The

23   last three American presidents have agreed that Russia's

24   attacks on Ukraine create a national emergency.  But few people

25   want to see America join that war.  The sanctions McGonigal

NCEVMCGS

violated are one of the tools our presidents have chosen to address that national emergency without making matters even worse.

Second, your Honor, any sanctions violation undermines the sanctions.  Sanctions only work if they are followed.  To choose a different example, nine out of ten western banks might follow the sanctions and not do business with an oligarch who is facing them.  But if the tenth bank doesn't do the same, then the oligarch has access to the western banking system and the sanctions fail.

And the third I want to stress for your Honor is the collateral harm McGonigal's crime could have inflicted.  That was, at the very least, significant.  As we pointed out in our submission and as your Honor likely knows from the news, American sanctions are controversial in the international community.  Countries we disagree with do not like it when we use our economic might to influence world policy; and they are happy for any opportunity to criticize the sanctions.

Think about what an opportunity McGonigal gave them, a former senior FBI official violating the sanctions.  And your Honor, not just any senior official, an official who used to be responsible for enforcing the sanctions and, according to him, doing so to help one sanctioned person gain a business edge over a business rival.  You could barely script a better story for someone who wanted to criticize the legitimacy and the

NCEVMCGS

probity of our sanctions regime than what McGonigal tried to do here.

I do want to be clear, your Honor, that Deripaska's and McGonigal's efforts failed.  FBI agents from the same division that he used to supervise stopped him just a few months into his scheme.  McGonigal never got his millions, and Deripaska never got that dirt he was trying to gather on his rival, so none of that information made its way into the sanctions process.  But still, McGonigal — and I think, more importantly, this Court — know just how serious the conspiracy here was.

Your Honor already has our written submission, as you said, and so I'm not going to walk through the detailed analysis of why each of the 3553(a) factors supports a top-of-the-guidelines sentence.  Instead, I want to focus on the major dispute in the parties' papers.  And I think what that is, is how the Court should weigh McGonigal's time with the FBI.  We see it as a substantial aggravating factor for a lot of the reasons I've just discussed.  But McGonigal claims that as a mitigating factor, asking that he receive significant lenience — and, in fact, no jail time at all — based in large part on what he did for his country before he began committing crimes against it.

To explain why your Honor should accept our view, I think it helps to start with the law.  The guidelines on which

NCEVMCGS

1    the parties agree here, your Honor, contain a departure

2    provision for exceptional public service.  Everyone agrees that

3    doesn't apply here.  That's not in the plea agreement; everyone

4    has agreed not to seek a departure.

5         The guidelines also contain an enhancement for abuse

6    of a special skill.  Everyone agrees that does apply here, and

7    I don't think there's any dispute that the special skills in

8    question are the investigative and counter-espionage skills

9    that McGonigal learned with the FBI.  So the guidelines here

10   support our view and provide no support for McGonigal's.

11        Now, this Court is, of course, free to consider

12   McGonigal's arguments under Section 3553(a).  But there is, as

13   your Honor saw in our submission, a lot of precedent rejecting

14   those arguments.  Whether it's other judges in this district,

15   the Second Circuit, or other circuits, time and again, courts

16   have explained that when someone who rose high in our society,

17   uses that position to commit a crime, he cannot turn around and

18   claim as mitigation the good deeds who got him that high

19   position.  McGonigal's time as SAC was supposed to be the

20   reward itself for all his good deeds.  When he abused that

21   position, the good works lost their value, your Honor.  They

22   became the means by which he advanced himself to the perch that

23   made his crimes possible, as many courts have said in rejecting

24   similar arguments for leniency that McGonigal is making here.

25        And your Honor, I think those courts were right.

NCEVMCGS

Their decisions give force to society's notions of just

punishment and respect for the law, which are factors this

Court considers under Section 3553(a).  One way to look at it,

I think, your Honor, is that everyone who is going to speak in

court today has or has had a position in our justice system.

And there is a temptation to think of those jobs in terms of

sacrifice, to think that we could make more money or work less

hours or have more time with our families if we were in the

private sector.  But that is not how the public thinks of it,

your Honor.

No one driving an Uber in the Bronx or sweeping

hallways in Manhattan is pitying McGonigal's opportunity to do

an incredibly interesting, rewarding, and prestigious job.

None of them feels pangs of sympathy because their tax dollars

let him earn about five times what they make.  None of them are

saying, I hope this Court goes easy on him given all that

sacrifice.

Your Honor, they are thinking about what an awesome

privilege and opportunity their country gave McGonigal; about

how much better off than them he is in return for his promise

to serve them.  And they are worried that high officials like

McGonigal abuse that trust; that they are serving themselves

rather than all the drivers and janitors and school teachers

who don't have his power.  So they are expecting us, I think,

to do what the Court said in *Sampson*:  To hold our public

NCEVMCGS

1    officials to a higher standard.

2            Your Honor, I want to be clear that McGonigal

3    committed the crime before this Court after he retired.  It

4    would be far worse if he did this while still at the FBI.  But

5    that does not support his request for a below-guideline

6    sentence.

7            The guidelines here do not contain the enhancement for

8    abusing a public position.  McGonigal faces the same guidelines

9    any private citizen would face if he used a special skill to

10   violate our national security sanctions.  For example, an

11   Iranian engineer who used his technical skills to violate the

12   sanctions against Iran would face the same guidelines

13   recommendation that McGonigal does.  So we think the fact that

14   McGonigal laid the groundwork for his crimes while serving as a

15   special agent in charge, and then went to work for the very

16   same criminals he had been investigating makes his crimes far

17   worse.

18           But the Court does not have to agree with us to impose

19   the sentence we seek.  The Court does not have to conclude that

20   McGonigal deserves the same punishment it would impose if he

21   were an active duty government officials who secretly went to

22   work for Deripaska.  It need only agree with the Sentencing

23   Commission's recommendation for anyone who did what he did; to,

24   at the very least, your Honor, reject McGonigal's claim for

25   special leniency based on the same public service that enabled

NCEVMCGS

his crimes.

Your Honor, the last thing that I want to do is respond to McGonigal's argument that his crimes are less serious than a case in which someone exported goods with military uses. And we laid out in detail on our submission why we think that's wrong; but I want to suggest another way of looking at it.

Your Honor could imagine that if Deripaska or even Putin himself was offered a choice of buying one of two things with the several million dollars McGonigal hoped to make. Choice one is military supplies, night vision goggles, carbon fiber, even weaponry. Choice two is having a former FBI counterintelligence chief on their payroll. Which of those two things would they choose? What is more valuable to them?

I don't think that's a hard question to answer. I think McGonigal himself said so why. When he was addressing the corruption of Russia's security services less than a year before he took Deripaska's money, he told the Atlantic Council that when a counterintelligence agency sells its services to the highest bidder, it erodes any rule of law in that country.

Your Honor, how much would Putin ask his oligarchs to pay to do that here? How much would that be worth to them?

Your Honor, our enemies have guns and they know where to buy more. What they do not have is the rule of law. We do. That is what McGonigal tried to sell. And that is why his

NCEVMCGS

1    crime merits the highest punishment the law will permit this

2    Court to impose.

3              Thank you, your Honor.

4              THE COURT:  Mr. Scotten.

5              Mr. DuCharme.

6              MR. DuCHARME:  Thank you, your Honor.

7              I think I'll start out just by saying I was a little

8    bit surprised that the government opened with some of the

9    conduct that I think really relates more to the D.C. cases.  I

10   think you know in D.C. Mr. McGonigal pled guilty to failing to

11   disclose things relating to business relationships he had.  We

12   actually tried to combine those cases for resolution over the

13   summer; the United States didn't want to do that.  So I'm not

14   really going to respond to things outside the scope of the

15   offense here, which is the post-employment agreement to conduct

16   research for Deripaska.

17             Judge, you know, the statute of conviction gives you

18   discretion to impose a sentence within zero to five years.  And

19   we've tried to take a very reasoned approach in helping to

20   guide the Court to what is an appropriate sentence in the case.

21             You know the 3553(a) factors.

22             Fundamentally, what it boils down to is what

23   specifically did he do, who is he, and what's a punishment

24   that's greater -- sufficient, but, not greater than necessary,

25   to meet the ends of justice when you look at other IEEPA cases.

NCEVMCGS

1          And Ms. Maloney is going to talk a little bit in a
2     moment about some unique circumstances relating to
3     Mr. McGonigal.  But I think, particularly in light of the
4     government's presentation, it bears me focusing a little bit on
5     the specific conduct.  And I just really want to be crystal
6     clear about this.

7          After Charlie left the FBI, he met Oleg Deripaska.  He
8     met him in London in a prestigious international law firm with
9     a lawyer.  But I think the government agrees that that part
10    would have been legal, because there is the carve-out for
11    certain legal representations.

12          That didn't go through.

13          So this person, Fokin, reaches out to Charlie after
14    that at some point.  And just to be clear, as far as
15    Mr. McGonigal knows, Fokin is not, as I guess is rumored in the
16    media, to be a Russian intelligence officer.  That's not his
17    understanding.  But he certainly knows him to be associated
18    with Oleg Deripaska; and he certainly knows that Deripaska is
19    on the sanctions list.

20          And what he's pitched is, you know, will you agree to
21    conduct some research for Deripaska relating to another Russian
22    oligarch, this guy Vladimir Potanin.  And ultimately, if we
23    find derogatory stuff, we'll give it to the U.S. government.
24    And that's essentially to level the playing field for
25    Deripaska.  Presumably — and rightly so — he's feeling the heat

NCEVMCGS

1   of some of these U.S. sanctions, and he's frustrated.

2           So that's what Charlie is offered and that's what,

3   unfortunately, Charlie agrees to do.

4           And to the government's credit, the efforts didn't get

5   very far.  Charlie is interviewed coming back from a business

6   trip around Thanksgiving.  His wife is separately interviewed.

7   And they disrupt him.  He stops.  He made about $17,500.  And

8   you know, interestingly in this what is bad for America, what

9   is good for America, and I'm very sensitive to this, and I

10  think it's important to Charlie's motive, which is not an

11  element here, but I think it's relevant for your consideration.

12  He agrees to do this research.  Ultimately, he thinks it's

13  going to go to the Treasury Department to level the playing

14  field.  The U.S. government actually ultimately sanctions

15  Vladimir Potanin.

16          So this is a very unusual case in the sense that had

17  the defendant's plan succeeded, the same thing happened that

18  the U.S. government would have done.  And I get that's not the

19  whole case and there are significant government interests here,

20  principally, the need to promote respect for the law, like we

21  get that.

22          But the conduct itself, I mean, I think the government

23  even notes in its brief, the thing he was actually asked to do

24  didn't seem particularly nefarious.  And by agreeing to do the

25  work, he breaks the law.  But I think what's going on here —

NCEVMCGS

1   and I appreciate it, and I heard it from the government this

2   morning too.  What's going on here is that there's a great

3   concern for what Charlie could have done if there had been more

4   taskings from this very nefarious person.  And given the

5   special skills and the abilities that he has, and you know in

6   detail about some of those skills from a top secret submission.

7   And that's fair.  They disrupt him.  They are worried about

8   what he could have done.  But I think we've got to stay focused

9   on what he actually did.

10          And with respect to crimes that implicate IEEPA, IEEPA

11   is an important statute; it does encompass a broad range of

12   conduct.  And some of the examples, you know, that Mr. Scotten

13   gave, and if you look at the cases, yeah, there's IEEPA cases

14   where -- finish trying to build a stealth fighter plane for the

15   Chinese, trying to help the Iranians build a nuclear reactor.

16   I respectfully submit that while this case is serious, that

17   kind of conduct is more serious than what Mr. McGonigal

18   actually agreed to do.  So you've got to look at his conduct in

19   some context.

20          The government has also said, which we agree with, no

21   one knows better than Charlie McGonigal the gravity of his

22   crime.  That's true.  And I think it raises a question that may

23   well be on your mind; it's been on our minds, the public ask,

24   people ask us all the time:  How could Charlie have agreed to

25   do this?  Twenty-two years in the FBI, senior position.  How

NCEVMCGS

1    could he have agreed to provide a service to somebody like Oleg

2    Deripaska, who's on the sanctions list?

3           And we've thought a lot about that.  And I think some

4    of it goes to the scope of work, right.  So it's he's not,

5    thankfully, agreeing to do some of the things that Deripaska

6    may have ultimately asked him to do.

7           But I think another thing that's really going on here,

8    Judge — and I think you'll appreciate this, you know, because

9    you've read the top secret submission and you've seen the life

10   that Charlie lived for 22 years.  I think what's going on here

11   to some extent is that he's out of the FBI, but now he's

12   confronting a situation that looks somewhat familiar to him

13   based on his experience.  You know, he's got a significant

14   Russian -- he's got a view that maybe work that he does will

15   benefit the U.S. government.  There's risk involved, there's

16   sensitivities to it, and there's a financial incentive.

17          And so he makes a terrible decision.  He says, This

18   looks exciting.  This looks enough like what I used to do.

19   There's risk, there's reward, there's maybe U.S. national

20   security interest at the end of the day.  So he makes a

21   terrible decision to work for Deripaska.  He breaks the law.

22   He destroys his own life.  Causes great distress in his family.

23   And he causes -- I mean, let's be frank, he causes

24   embarrassment to the FBI.  Charlie still loves the FBI as an

25   institution, dedicated his whole life to it, and it's a

NCEVMCGS

1    terrible, terrible decision.

2            And one of the critical mistakes he makes in embracing

3    this is that he no longer has the public authority that he had

4    as an FBI agent to operate in this space.  He's not the SAC

5    anymore; he's not a special agent doing counterintelligence

6    work.  He's out, and he's in the private sector.  Doesn't

7    excuse what he did, but I think, you know, we've thought long

8    and hard about this, why would Charlie McGonigal commit a

9    serious federal offense after that distinguished career?

10           Look, on his 22 years of service, Judge, of course you

11   can consider it.  I don't think there's any dispute that you

12   can consider it.  It's a highly unusual case.  Courts

13   routinely -- they're compelled to consider the personal

14   circumstances of the defendant.  And just never seen a case

15   where a defendant had a record like Charlie's.  And you've seen

16   it.  I can't obviously talk about it; it's top secret.  We've

17   been very respectful, and rightly so, of the sensitivities of

18   his work.  But it's different in kind.  And we're just asking

19   you to consider it like any other 3553(a) factor.

20           And I don't think it's fair to compare.  You know,

21   even though he got to be the SAC and he had these prestigious

22   positions, it's not high society.  I mean, he has prestige and

23   he has respect, but it's not like a white-collar defendant

24   who's a billionaire in a country club and has these

25   relationships.  It's just different in kind.  So this is an

NCEVMCGS

1    unusual case.

2              Now, the meeting, your Honor, that we had with the

3    government after his plea, I filed the paragraph under seal

4    after talking, you know, to the prosecutor who coordinated that

5    meeting.  It made sense to me.  We spent seven hours with seven

6    different U.S. government offices at their invitation.  We

7    answered all their questions.  It felt very serious; it felt

8    very sensitive.  I'm not going to talk about the substance of

9    it unless you ask me about it because that was clearly

10   communicated to me.  I couldn't bring Ms. Maloney.  I couldn't

11   bring a laptop.  And I understood it was sensitive.

12             It's ultimately up to the United States government to

13   decide of what help it was.  When I talked to the prosecutor,

14   she said, We have no reason to think he was anything other than

15   truthful.  We don't need to talk to him again.  I said I would

16   file it under seal for reasons that were obvious to me.  And I

17   still want to respect that.  But it's really not our equity in

18   that being sealed.  I still think it's the government's.  It's

19   up to you whether or not the substance of that is relevant, but

20   I just needed to be clear about that.

21             So I think you can at least consider it.  Other courts

22   have considered good-faith efforts by a defendant to cooperate

23   that were short of substantial assistance.  I think the fact

24   that when he went in for seven hours and talked to the seven

25   offices that you're aware of matters.

1          Now the case law.  We cannot find a case obviously

2     that's on point with this case.  There's no case just like

3     this.  We started with the sentencing data, as the probation

4     department did.  It's relevant.  The Sentencing Commission data

5     indicates that, you know, similarly situated defendants under

6     this guideline have an average sentence of 18 months.  It's a

7     starting point.

8          There are plenty of low sentences in IEEPA cases.

9     Sometimes they are harder to find.  We found one since we filed

10    our submission, because they are not highly publicized.  We

11    found a case called *Gaillard* where Judge Ross sentenced the

12    defendant to probation in an IEEPA case.  The facts are

13    distinguishable.  Though I think the cases that are closest to

14    this one, Judge, that we could find are probably the

15    *Sheikhzadeh* case and the *Cabelly* case.

16         *Sheikhzadeh* was a guy who was providing information

17    for a period of five years to Iranian government officials.  It

18    wasn't classified, but it had strategic value.  He was paid

19    $50,000.  He lied on some government forms.  And Judge Chen had

20    a very long sentencing hearing in that case.  And she said, you

21    know, it's espionage-ish, but it's not really espionage.  And

22    she gave him three months.

23         In *Cabelly*, that defendant actually had worked for the

24    state department.  You know, like Charlie, he pled guilty to a

25    371 that implicated IEEPA, where he had been doing business

NCEVMCGS

1   with Sudan and, you know, he got eight months in prison.

2           So these are data points.  But the things missing from

3   *Sheikhzadeh* and from were *Cabelly*, you know, is the

4   extraordinary 22 years of service.  It's really hard to

5   quantify how that distinguishes Mr. McGonigal.  And I don't

6   think, Judge, you know, it's fair to say that Charlie brought

7   all of the skills and abilities that he developed in the FBI to

8   bring to the advantage of Oleg Deripaska, a man with whom he

9   did not deal directly, even in connection with the agreement to

10  conduct this research.

11          So simply put, Judge, his work has got to count for

12  something.  And if you look at IEEPA cases in coming up with a

13  fair sentence, I think it's fair to distinguish agreeing to

14  conduct this research with some of the other conduct which, we

15  respectfully submit, is more serious.

16          Ms. Maloney is just going to talk briefly about some

17  personal characteristics of Charlie beyond what we've said in

18  the submission, and then I'm going to wrap it up.

19          MS. MALONEY:  Good afternoon, your Honor.

20          I'll be addressing just briefly two of the sentencing

21  factors:  the history and characteristics of the defendant and

22  the need for just punishment, both of which weigh strongly in

23  favor of a noncustodial sentence in this case.

24          As Mr. DuCharme mentioned, Charlie is not your average

25  defendant.  No one here disputes that.  What is in dispute is

1   how much weight your Honor should give to what makes Charlie so

2   unique, which is his over 22 years of service to this country.

3         In those 22 years, Charlie did some truly remarkable

4   things, many of which we can't even discuss in open court today

5   because of the sensitivities.

6         He began as a line agent in New York City

7   investigating suspected terrorist attacks, and played an

8   instrumental role in preventing at least one planned attack on

9   the New York City subway.  He spent four months boots on the

10  ground in Tanzania digging through the rubble at the site of

11  the U.S. Embassy bombings alongside Marines of Somalia, and

12  later helped track down a confessed child rapist and murderer

13  after a five-day manhunt near his hometown in Ohio.

14        Charlie had just left for a paternity leave when the

15  devastating attacks on 911 took place, and spent the following

16  weeks helping with recovery and cleanup at Ground Zero.

17        Just a few months ago, your Honor, this very

18  prosecution team sat before you and asked for a below-guideline

19  sentence for another defendant who also helped.  They were

20  cited in favor of the below-guideline sentence, his work,

21  volunteer work cleaning up the 9/11 site.

22        That's not happening today.  Today, the government is

23  arguing that Charlie's contribution to these investigations was

24  less significant than the investigations themselves; and that

25  he was simply somewhere in a lengthy chain of command.  Your

NCEVMCGS

1  Honor, the FBI clearly disagreed.  Charlie didn't simply happen

2  upon some of the highest-ranking positions in the bureau.  He

3  earned those positions through years of hard work and dedicated

4  service.  The government doesn't dispute those facts or those

5  in our classified addendum, but instead argues that the reward

6  for such a career should not be leniency at one's sentencing.

7       Your Honor, the government's argument does harm to the

8  plain language of Section 3553(a) and case precedent which

9  requires this Court to consider the defendant's history and

10  characteristics at sentencing.  As Judge Rakoff wrote in *U.S.*

11  *v. Adelson*:  If ever a man is to receive credit for the good he

12  has done, it should be at the moment of his sentencing, when

13  his very future hangs in the balance.

14       For Charlie, that moment is now.

15       Contrary to the government's assertions, the FBI was

16  more than just Charlie's job; it was his life's work.  His

17  wife, Pam, details the sacrifices made by Charlie and his

18  family as a result of that choice.  She describes the

19  excitement and pride he felt at being accepted to the academy,

20  giving up a position at a prestigious international bank in the

21  process.  She describes the months that he spent away from

22  their newborn children, the late nights and weekend work, the

23  missed vacations, and the heavy emotional toll it took on him,

24  all without complaint because he honored the responsibility he

25  was given to serve this country.

NCEVMCGS

1          As Mr. DuCharme mentioned, he continues to honor that

2     responsibility, even after his arrest and conviction, meeting

3     with the seven independent offices within the Justice

4     Department.

5          Your Honor, even under the pre-*Booker* mandatory

6     guidelines system, the Supreme Court recognized that military

7     or civic service warranted a below-guideline sentence if the

8     service was present to an exceptional degree.  Mr. McGonigal's

9     service is nothing short of exceptional and we believe it

10    weighs strongly in favor of a noncustodial, significantly below

11    guideline sentence at the least in this case.

12         Section 3553(a) also requires this Court to consider

13    the need for just punishment here.

14         Your Honor, for the last two years, Mr. McGonigal has

15    lived with the consequences of his actions, which has included

16    the loss of two jobs, his reputation, and strained

17    relationships with family and friends.  Contrary to the

18    government's arguments, the consequences have been felt far

19    more keenly in this case than in most due to the extraordinary

20    level of media attention that this case has achieved, no doubt

21    deterring any member of the public who's been following along

22    from future violations of U.S. sanctions.

23         As a result of this media attention, Charlie has been

24    demonized for far more than the conduct that he pleaded guilty

25    to.  He has been referred to as Red Charlie, a traitor and a

NCEVMCGS

Russian spy, not by only strangers on the internet, but also by

prominent public and political figures.

The overwhelming hate hasn't stopped with Charlie

though.  His wife and 24-year-old daughter have become the

target of personal harassment in the news and on social media.

A former White House staffer went so far as to call his

daughter sexist and vile names on social media simply because

of her relationship to Charlie.  Despite all of this, Pam and

his children remain steadfast in their support, describing him

as an irreplaceable presence in their daily lives.

Your Honor, a custodial sentence in this case would

only wreak further havoc on the McGonigal family when other

options are available and far more appropriate here.

Moreover, a noncustodial sentence does not equate to

an insignificant one.  The Second Circuit in *U.S. v. Stewart*

said that it is difficult to see how a court can properly

calibrate a just punishment if it does not consider the

collateral effects of a particular sentence.

Your Honor, with or without a prison term here,

Mr. McGonigal will never again hold a position with the federal

government, maintain a security clearance, or serve on a

federal jury.  He'll be ineligible to vote for any period of

probation that your Honor imposes, and he'll be a convicted

felon for the rest of his life.

In sum, your Honor, just punishment comes in a variety

NCEVMCGS

of forms, and we respectfully ask this Court to consider all of

the collateral consequences at play here in crafting an

appropriate sentence.

MR. DuCHARME:  Just in closing, Judge, we've done our

best to marshal the facts and the evidence to assist you

through this.  I think it is fair to say it's an unusual case.

We're confident you understand the conduct.  You've got a swift

acceptance of responsibility.  You've got the landscape of

IEEPA cases, his history of service, his good-faith efforts to

cooperate.

In closing, I'll just say, Judge, I'm reminded of a

sentencing before Judge Vitaliano, which bears some

similarities to this.  It was a former serviceman who had

admirably served his country, and then he started smuggling

guns to China; he got mixed up in some criminal conduct.

And when he appeared for sentencing, Judge Vitaliano

said to him:  Sir, any person who has served your country the

way you have is welcome in my courtroom regardless of the

circumstances that brought you here.

And I was taken aback, because we were asking for

quite a tough sentence.  But of course the judge considered his

history of service.  And Judge Vitaliano imposed a sentence of

time served, even though the conduct was serious and the

offense was serious.

And we take the law seriously, Judge.  We have respect

NCEVMCGS

1    for IEEPA.  We appreciate the hard work the government put into

2    this case.  We're grateful that Mr. McGonigal never went beyond

3    the conduct.  But we have no indication that there was any

4    particular thing more nefarious that he was going to do before

5    he was disrupted.  And that puts him in the position where he

6    now finds himself:  Ready to finally and fully accept

7    responsibility for what he's done, and to move forward with his

8    life the best he can to regain the trust of his country, his

9    friends, his family, and his colleagues.

10            And Mr. McGonigal is prepared to address you directly

11   if you'll hear him, your Honor.

12            THE COURT:  Yes, of course.

13            Mr. McGonigal.

14            THE DEFENDANT:  Good afternoon, your Honor.

15            Thank you for giving me the opportunity to speak to

16   you today.  As you can imagine, my situation and this entire

17   process has been very painful, both mentally and physically

18   exhausting, not only for me, but for my wife, my family, as

19   well as my friends, and I have many of them.

20            In feeling this way and reflecting on my actions, I

21   stand before you today with a deep sense of remorse and sorrow

22   for my actions.  I fully acknowledge the mistakes I have made,

23   and I appear before you taking full responsibility for my

24   conduct and actions.

25            In taking responsibility for my actions and reflecting

NCEVMCGS

1    on my situation, I recognize the pain, suffering, and

2    disappointment I have brought on myself, my family, my wife, my

3    friends, and my former colleagues at the FBI.  And for this I

4    am deeply sorry.

5           During my time of reflection, I have developed a

6    better appreciation for changes I need to make to be a better

7    person.  I recognize more than ever that I betrayed the

8    confidence and trust of those closest to me; and for the rest

9    of my life I will be fighting to regain that trust in becoming

10   a better person.

11          In reflecting on my conduct, I fully recognize where

12   and why I went astray and how my actions solely have brought me

13   before you today.  Your Honor, I am humbly asking for a second

14   chance to prove to you and those that I have caused pain,

15   suffering, and harm — and again to you, this Court — that I

16   will continue to be a law-abiding member of society going

17   forward for the remainder of my life.

18          I, more than anyone, know that I have committed a

19   felony.  And as a former FBI special agent, it causes me

20   extreme mental, emotional, and physical pain, not to mention

21   the shame I feel in embarrassing myself and the FBI, the

22   organization that I love and respect.

23          As you know, most recently I met with the government

24   for approximately seven hours in trying to be helpful and

25   provide any requested assistance.  In stating this, I am

NCEVMCGS

1    committed to focusing on being a better person, tending to my

2    personal health, and continuing to love and support my wife,

3    family, and friends.

4           I have sought counseling and spiritual support in

5    bettering myself as a person.  I am willing to take whatever

6    steps necessary to assure you and this Court that I can change

7    and that I can be a productive and sympathetic member of

8    society going forward for the remainder of my life.

9           I am prepared and promise to fully comply with the

10   Court's decision and conditions, and that I am remorseful and

11   wanting to make things right.

12          Your Honor, I ask you today for leniency in

13   administering my sentence.  I am prepared to accept the

14   consequences for my actions and will take the necessary steps

15   to live a respectful and responsible life going forward.

16          Thank you for your consideration.

17          THE COURT:  All right.  Thank you, Mr. McGonigal.

18          Counsel, is there any reason why a sentence should not

19   be imposed at this time?

20          MR. SCOTTEN:  No, your Honor.

21          MR. DuCHARME:  No, your Honor.  We're ready.

22          THE COURT:  All right.  I just need a minute to absorb

23   what I've been hearing.  I don't think it's worth taking a

24   recess though.

25          Before I start, I just want to thank very able counsel

NCEVMCGS

on both sides for their written submissions and oral

presentations.

I'm now going to describe the sentence that I intend

to impose.  I will give the attorneys an opportunity to make

legal objections before the sentence is actually imposed.

In imposing a sentence, I am required to consider the

factors that are set forth in 18 U.S.C., Section 3553(a).

These factors include:

First, the nature and circumstances of the offense and

the history and characteristics of the defendant.

Second, the need for the sentence imposed to advance

the purposes of sentencing, namely, one, to reflect the

seriousness of the offense, promote respect for the law and to

provide just punishment for the offense; two, to afford

adequate deterrence to criminal conduct; three, to protect the

public from further climbs of the defendant; four, and to

provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the

most effective manner.

Third, I must consider the kinds of sentences

available.

Fourth, the guidelines range.

Fifth, any pertinent policy statements.

Sixth, the need to avoid unwarranted sentencing

disparities.

NCEVMCGS

1          And seventh, the need to provide restitution to any

2   victims of the offense, although that factor is not applicable

3   here.

4          Ultimately, I am required to impose a sentence that is

5   sufficient, but not greater than necessary, to comply with the

6   purposes of sentencing that I mentioned a moment ago.

7          With respect to the guidelines, I've already

8   calculated the applicable range and we have been over that so I

9   will not rehash it here.

10         In short, the range in this case is 57 to 60 months'

11  imprisonment.

12         The defense requests a noncustodial sentence; the

13  government seeks a sentence of 60 months' imprisonment; and

14  probation recommends a sentence of 42 months.  So we have one

15  party recommending a sentence well below the guidelines range,

16  that being Mr. McGonigal; another party requesting a sentence

17  at the very top of the guidelines range, that being the

18  government; and probation making a recommendation that falls

19  somewhere in between the parties' diametrically opposed

20  requests.

21         On that note, I am aware that the parties' widely

22  disparate positions are hardly a product of mere happenstance;

23  they are a reflection of the competing principles underlying

24  the statutes and judicial decisions in this area.

25         On the one hand, the government impresses upon the

NCEVMCGS

1   Court the significant national security interests; that the

2   International Emergency Economic Powers Act was enacted to

3   safeguard interests that the defendant in this case not only

4   endangered over a yearslong period, but which he did by

5   leveraging with impunity for some time his position as one of

6   the country's highest-ranking intelligence officials, all in

7   the name of personal enrichment.

8          The extraordinary seriousness of this conduct calls

9   for significant punishment.  That is the theme or stance, so to

10  speak, of the government's arguments.

11         For its part, the defense urges the Court to remember

12  that before it stands a human being whose full professional and

13  personal record should be taken into account, including a

14  decades-long record of otherwise exceptional public service

15  which the government itself has referred to as a distinguished

16  career; the indelible role the defendant has played in his

17  family; and his accountability and deep repentance for his

18  deeper conduct.  That conduct, in any event, did not involve

19  the kind of direct assistance to hostile foreign nations that

20  was provided by defendants in many other IEEPA cases where

21  custodial sentences were imposed.  According to the defense,

22  this holistic picture of the defendant must be taken into

23  account today, that is the crux of their position.  Under

24  3553(a), I must consider both.

25         To start, it is unquestionable that the offense for

NCEVMCGS

1  which Mr. McGonigal stands convicted was extraordinarily

2  serious and compels a substantial term of incarceration.

3  Through his actions, Mr. McGonigal repeatedly flouted and

4  manipulated a sanctions regime that is vital to our country's

5  national security and foreign policy interests.

6          Indeed, the sanctions relevant to this case were

7  considered so important that they were imposed by three

8  different presidential administrations.  These sanctions

9  crucially allow our government to put economic and political

10  pressure on bad actors to achieve peaceful outcomes without

11  need to resort to more drastic steps such as military force.

12  If nations such as Russia can avoid or influence these

13  sanctions through conduct like Mr. McGonigal's, then the

14  sanctions will be ineffective, increasing the risk of war.

15          While Mr. McGonigal very well may not have intended to

16  harm America's national security by agreeing to work with a

17  known sanctioned individual in a way that violated the law,

18  that is precisely what he ended up doing.  That in and of

19  itself renders Mr. McGonigal's conduct very serious.

20          The gravity of Mr. McGonigal's conduct is exacerbated

21  by the manner in which he carried it out.  As the special agent

22  in charge of the counterintelligence division of the New York

23  FBI field office, Mr. McGonigal occupied what by all accounts

24  is one of the highest-ranking, most important intelligence

25  positions in the country.  It was while serving in that role

NCEVMCGS

that Mr. McGonigal began a concerted yearslong effort to

exploit the information, his skills, and the contacts he had

cultivated for the purpose of developing relationships that

could financially enrich him after he left the FBI.  This

culminated in work beginning in or around 2021 for Russian

national Oleg Deripaska, in violation of sanctions the United

States had imposed on Deripaska in 2018.

Mr. McGonigal well knew that his actions violated

those sanctions, in part because while serving as the special

agent in charge, he had received then-classified information

that Deripaska would be added to a list of Russian oligarchs

with close ties to the Kremlin who would be considered for

sanctions as a result of Russia's 2014 attack on Ukraine.  In

the face of that knowledge, Mr. McGonigal forged ahead with his

work for Deripaska and, in the process, actively took steps to

conceal his crimes, including using encrypted communications

and not referring to Deripaska by name.

Through these actions, Mr. McGonigal posed great risk

to national security, undermined the legitimacy of American

sanctions, and flouted the rule of law.  And he did so after

having previously held a position of trust in enforcing those

sanctions and upholding the law, using the very special

investigative skills he developed with the FBI to prevent

violations of our national security, not to participate in

them.

NCEVMCGS

1          The undeniable seriousness of this and the need to

2     promote respect for the law, to provide just punishment for the

3     offense, and to ensure general deterrence compels a meaningful

4     custodial sentence.

5          At the same time, there are some notable factors that,

6     in my review of the history and characteristics of the

7     defendant pursuant to 18 U.S.C., Section 3553(a), should not be

8     discounted.  Courts have expressly recognized consideration of

9     prior good acts in determining a defendant's sentence.

10          Mr. McGonigal had a long distinguished career as a law

11     enforcement professional and public servant, making some

12     profoundly important contributions to our government in the

13     process.  This is borne out by information I reviewed in

14     Mr. McGonigal's classified supplement, as well as in letters in

15     support from former colleagues.

16          While with the FBI, Mr. McGonigal played leading roles

17     in sensitive high-stakes intelligence and counter-espionage

18     operations, both in the United States and in high-risk areas

19     abroad which yielded valuable information.  The serious

20     criminal acts Mr. McGonigal later went on to commit — and

21     again, I stress the word "serious" — do not altogether stamp

22     out those contributions in earlier years.  Under Section

23     3553(a), a defendant's sentence rests on more than the offense

24     in and of itself.

25          I also want to note the numerous thoughtful and

NCEVMCGS

1    emotional letters submitted by family members and friends who

2    consistently describe Mr. McGonigal as deeply compassionate and

3    caring with a steadfast generosity and kindness.  In addition,

4    I will mention Mr. McGonigal's contrition and the

5    accountability he has taken, including in his statements during

6    his plea allocution and the statement he submitted with his

7    sentencing submission and in his overall manner here in court.

8    His decision to proactively seek counseling relating to alcohol

9    consumption reflects a commendable degree of introspection.

10    While these factors certainly do not neutralize Mr. McGonigal's

11    criminal conduct, they are worthy of consideration and, taken

12    together, support a sentence modestly below the applicable

13    guidelines range.

14             With all of that said, I will state the sentence I

15    intend to impose.

16             Mr. McGonigal, would you please rise.

17             Mr. McGonigal, after considering the factors set forth

18    in Section 3553(a) of Title 18 of the United States Code, I

19    find that a sentence of 50 months' imprisonment is sufficient,

20    but no greater than necessary, to comport with the purpose of

21    sentencing.  I will order a term of three years of supervised

22    release to be completed upon your release from prison.

23             You may be seated, if you wish, as I read the

24    remaining conditions.

25             I'm now going to read the conditions of supervised

NCEVMCGS

release that you must comply with along with other details of
your sentence.

During your term of supervised release, you will be
subject to the mandatory conditions set forth on pages 32 to 33
of the presentence report.  Those include the following:

You must not commit another federal, state, or local
crime; you must not unlawfully possess a controlled substance;
you must refrain from any unlawful use of a controlled
substance; and you must submit to one drug test within 15 days
of your release from prison and at least two periodic drug
tests thereafter; and you must cooperate in the collection of
DNA as directed by the probation officer.

In addition, the standard conditions of supervised
release shall apply.  Those are listed on pages 33 and 34 of
the PSR and will be set forth in the judgment.

Mr. McGonigal, would you like me to read those
standard conditions to you?

THE DEFENDANT:  No, your Honor.

THE COURT:  You must also meet certain specialized
conditions of supervised release that I will impose.

The first is that you must participate in an
outpatient mental health treatment program approved by the
United States Probation Office.  You must continue to take any
prescribed medications unless otherwise instructed by the
healthcare provider.  You must contribute to the cost of

NCEVMCGS

1  services rendered based on your ability to pay and the

2  availability of third-party payments.

3          Second, you shall participate in an outpatient

4  treatment program approved by the United States Probation

5  Office, which program which include testing to determine

6  whether you are using drugs or alcohol.  You must contribute to

7  the cost of services rendered based on your ability to pay and

8  the availability of third-party payments.  The Court authorizes

9  the release of available drug treatment evaluations and

10  reports, including the presentence report, to the substance

11  abuse disorder treatment provider.

12          Third, you must provide the probation officer with

13  access to any requested financial information.

14          Fourth, you must not incur new credit charges or open

15  additional lines of credit without the approval of the

16  probation officer unless you are in compliance with the

17  installment payment schedule that I will address in a few

18  moments.

19          Finally, I'm going to recommend that you be supervised

20  by the district of wherever you reside upon your release.

21          There is no restitution in this case.

22          Regarding forfeiture, on August 15th, 2023, I entered

23  a consent preliminary order of forfeiture pursuant to which

24  Mr. McGonigal agreed to the forfeiture of $17,500 representing

25  the amount of proceeds traceable to the instant offense.  That

NCEVMCGS

1    order will become part of the judgment in this case.

2            As for a fine, the guidelines range is 20,000 to

3    200,000.  I note that Mr. McGonigal completed a financial

4    affidavit, and that is in paragraph 84 of the presentence

5    report.

6            Based on the information available to me, I conclude

7    that Mr. McGonigal has not demonstrated an inability to remit a

8    fine.  The probation department has recommended that I impose a

9    fine of $20,000.  The government urges that I impose a fine of

10   $200,000.  I find that a fine is appropriate.  Under the

11   circumstances, I am imposing a fine of $40,000.

12           Additionally, I must impose a mandatory special

13   assessment of $100 which shall be due and payable immediately.

14           Mr. DuCharme, do you have a request for a designation

15   recommendation to BOP?

16           MR. DuCHARME:  I guess we have two requests, really.

17           The first is a recommendation for a facility in the

18   New York area where his family is.

19           And related to that, because, you know, we're

20   preparing for another sentencing in February in D.C., if

21   Mr. McGonigal could be permitted to voluntarily surrender to

22   the BOP facility that's designated after your Judgment and

23   Commitment is entered, sometime after his sentencing in D.C.,

24   we'd appreciate that, Judge.

25           THE COURT:  All right.  I'll give the government a

NCEVMCGS

1    chance to respond to that in a moment.

2           Mr. DuCharme, is Mr. McGonigal a candidate for the

3    Residential Drug Abuse Program?

4           MR. DuCHARME:  He doesn't have a -- I mean he's -- I

5    don't know, to be frank, your Honor.  Beyond his alcohol use,

6    which he's addressed himself, we don't have concerns about

7    other substance abuse.

8           THE COURT:  I'm aware of that.  I'm thinking of the

9    references in the presentence report to the alcohol use.

10          MR. DuCHARME:  I think he would be a good candidate

11   for ongoing treatment with respect to that, your Honor.

12          THE COURT:  Would you like him to be recommended for

13   RDAP or --

14          MR. DuCHARME:  Yes, your Honor.

15          THE COURT:  All right.

16          All right, now --

17          MR. SCOTTEN:  Your Honor, I have some concerns on

18   that.  I too am not familiar with the -- whether the parameters

19   of RDAP apply simply to someone who has claimed that they drank

20   too much wine on occasion.  But it does allow for a significant

21   decrease in sentence when completed, and I don't want that to

22   undermine the gravity of the Court's sentence.  If he qualifies

23   for it, we're certainly not begrudging it; but I'm concerned

24   that that program applies for, to hypothesize, a heroin addict

25   who's committing crimes because of their addiction.  The theory

NCEVMCGS

1    being, well, they can get out of prison earlier because, having

2    cured their addiction, they won't commit crimes.

3                I don't think there's any argument here that

4    Mr. McGonigal was committing crimes because of his alcohol use.

5    So I think the Court should leave that to the assessment of

6    BOP.  If he qualifies for it and they really think he needs it,

7    we're not objecting, but I don't want it to come in with a

8    judicial recommendation that's going to undermine the sentence

9    the Court just imposed.

10               THE COURT:  Mr. DuCharme?

11               MR. DuCHARME:  I think, Judge, the defendant has

12   recognized his own problems with alcohol.  While he's out of

13   custody, he's been seeking treatment.  I think it would be in

14   the collective interest to provide Mr. McGonigal with the

15   opportunity — and we appreciate your recommendation — for him

16   to continue treatment in the RDAP program or, as the government

17   suggests, as the BOP sees fit.  But your recommendation, I

18   think, is consistent with a positive step that he's taken to

19   try to mitigate some of the poor decisions he's made in his

20   life.  So we support your recommendation and appreciate it.

21               THE COURT:  I will note that according to the PSR, the

22   issue arose more than 12 months before his arrest.  It dates

23   back to almost two years, which is relevant.  And I do think

24   there is precedent for recommending the treatment in the RDAP

25   program, so I am going to recommend it.  Of course, it is up to

NCEVMCGS

1    BOP ultimately whether he qualifies and whether they want to

2    put him in that program.

3            Let's talk about voluntary surrender and positions on

4    that.  I know Mr. DuCharme --

5            MR. SCOTTEN:  We don't have objection to a surrender

6    date, your Honor.  I suppose the Court -- and we agree it

7    should be after his sentencing in Washington, D.C.; that's just

8    going to be logistically better for everyone.  So I would ask

9    the Court to set a date something like 30 days after that.  And

10   of course, if complications arise in the D.D.C. sentencing,

11   Mr. DuCharme could always petition the Court to move it, and we

12   might not object if it was reasonable.

13           THE COURT:  All right.  So I am looking at a surrender

14   date of approximately two and a half months out from now, which

15   is February 26, 2024.  That's a Monday.  And I believe that is

16   after the sentencing that's scheduled in the D.D.C. case, which

17   is going forward on February 16th, Mr. DuCharme.

18           MR. DuCHARME:  That's correct, your Honor.

19           THE COURT:  All right.  I'm going to provide for a

20   surrender date of February 26, Mr. McGonigal, by 2 p.m. on that

21   day, February 26, 2024.  You will surrender to the designated

22   institution.  If you have not been designated to an institution

23   by February 26, 2024, you will surrender by 2 p.m. to the

24   United States Marshal for this district.  If you were to fail

25   to appear for surrender on February 26, 2024 at 2 p.m., you

NCEVMCGS

1  would be committing a separate federal offense for which you

2  can receive a separate and consecutive sentence.

3           In addition, the conditions on which you have been

4  released will continue to apply up until the time you report

5  for your sentence.  If you violate the conditions of release,

6  you run the risk, among other things, of the Court remanding

7  you right away.  Do you understand all of that?

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  Does either counsel know of any legal

10 reason, other than anything we have already discussed, as to

11 why the sentence should not be imposed as stated?

12          MR. SCOTTEN:  No, your Honor.

13          MR. DuCHARME:  No, your Honor.

14          THE COURT:  Mr. McGonigal, for the reasons previously

15 stated, it is the judgment of this Court that you be sentenced

16 to 50 months' imprisonment and three years' supervised release.

17 Your term of supervised release will be subject to the

18 mandatory, standard, and special conditions I described.  You

19 are ordered to pay a fine of $40,000 and a special assessment

20 of $100.  As set forth in the consent preliminary order of

21 forfeiture, you are directed to forfeit $17,500 to the

22 government.

23          I do recommend to the Bureau of Prisons that

24 Mr. McGonigal be designated to a facility in the New York area

25 as close as possible to his residence so that he may maintain

NCEVMCGS

1    ties with his family during the period of his incarceration.

2           I also recommend that Mr. McGonigal participate in the

3    RDAP program during his term of incarceration, which will

4    ultimately be determined by BOP.

5           I'm going to turn now to some final matters before we

6    adjourn.

7           I don't think there are any open counts, Mr. Scotten,

8    is that true?

9           MR. SCOTTEN:  There are underlying counts in the

10   initial indictment, your Honor.  And we move to dismiss any

11   counts on which Mr. McGonigal was not convicted.

12          THE COURT:  All right.  I will dismiss those counts at

13   this time.

14          Mr. McGonigal, I advise you that you have the right to

15   appeal from the judgment imposing the sentence to the extent

16   you haven't waived it.  If you are unable to pay the cost of an

17   appeal, you may apply for leave to appeal *in forma pauperis*.

18   If that application were granted, you would be permitted to

19   appeal without the payment of any fees.  The notice of appeal

20   must be filed within 14 days of the Judgment of Conviction.

21          Mr. Scotten, is there anything else we should discuss

22   today?

23          MR. SCOTTEN:  I don't think so, your Honor.

24          Thank you.

25          THE COURT:  Mr. DuCharme, anything else?

NCEVMCGS

1          MR. DuCHARME:  No, your Honor.

2          THE COURT:  All right.  Mr. McGonigal, I hope that you

3   pass the time ahead without issue; that your family and friends

4   and community continue to support you in the manner that they

5   have; that you are reunited with them afterwards; and that you

6   continue to live a life that does not involve criminal

7   activity.  And I wish you well in that regard.

8          Thank you.  We are adjourned.

9                            *    *    *