**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


UNITED STATES OF AMERICA,    .
                            .
          Plaintiff,       .  CR No. 23-CR-0021 (CKK)
                            .
      v.                  .
                            .
CHARLES F. MCGONIGAL,      .  Washington, D.C.
                            .  Friday, February 16, 2024
          Defendant.     .  2:52 p.m.
. . . . . . . . . . . . . . . .


**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY**
**UNITED STATES DISTRICT JUDGE**


<u>APPEARANCES</u>:

For the Government:         ELIZABETH A. ALOI, AUSA
                            STUART D. ALLEN, AUSA
                            U.S. Attorney's Office
                            601 D Street NW
                            Washington, DC 20530

For Defendant:             SETH DUCHARME, ESQ.
                            MEAGAN MALONEY, ESQ.
                            Bracewell LLP
                            31 W 52nd Street
                            Suite 1900
                            New York, NY 10019

Court Reporter:           BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                     P R O C E E D I N G S

2          THE DEPUTY CLERK:  Criminal case 23-021, the United

3    States versus Charles McGonigal.  Counsel, please identify

4    yourselves for the record.

5          MS. ALOI:  Good afternoon, Your Honor.  Liz Aloi and

6    Stuart Allen for the United States.

7          THE COURT:  All right.  Good afternoon.

8          MR. DUCHARME:  For Mr. McGonigal, Seth Ducharme, and

9    I'm joined at counsel table by Meagan Maloney.  Good afternoon.

10         THE COURT:  All right.  Good afternoon.  And good

11   afternoon, Mr. McGonigal.

12         THE DEFENDANT:  Good afternoon, Your Honor.

13         THE COURT:  All right.  We're here for a sentencing.

14   Mr. McGonigal pled to Count 1, which is concealment of material

15   facts.  The statutory penalties are a maximum of five years in

16   jail, a maximum fine of $250,000.  He's compliant with his

17   pretrial conditions.

18    I have a presentence report, the United States' sentencing

19   memorandum, the defendant's memorandum in aid of sentencing,

20   which included I believe about 15 exhibits that were attached.

21   I also received at a later date a letter from defense counsel

22   regarding some treatment that Mr. McGonigal is receiving.  I

23   also reviewed the classified material that defendant filed as a

24   supplement.  I will just generally characterize it as the

25   assignments that Mr. McGonigal was involved with.

1    I did receive some private letters and other material from

2    various I would call Albanian sources.  I've shared them with

3    counsel.  I've not read them.  I do have my clerks look at them

4    just to make sure there's nothing in there that I should be

5    aware of.  Since I've made them available to both counsel,

6    neither counsel have requested and in fact objected to my

7    considering them, so I have not considered them.

8    In terms of objections, there were objections to the

9    calculations.  I've issued a separate opinion which ultimately

10   agrees with probation's calculations.  And that I believe takes

11   care of that aspect of it.

12   Based on that, the advisory sentencing guidelines, the

13   offense level -- the base offense is 14, the additional counts

14   of three, another two points equal 19 points, minus three for

15   acceptance of responsibility.  So the offense level is 16.

16   In terms of criminal history, he does have three points for

17   the case in New York, the conspiracy to violate the

18   International Emergency Economic Powers Act, which places him in

19   criminal history category II.  And the advisory sentencing

20   guideline range, in terms of custody, 24 to 30 months,

21   supervised release one to three years, probation one to five

22   years, a fine $10,000 to $95,000.  Restitution is not

23   applicable, and the special assessment is $100.

24   For those parts of the presentence report that are

25   undisputed, my findings are pursuant to Federal Rule of Criminal

Procedure 32(i)(3)(A).  For those parts that are disputed, my findings are pursuant to Federal Rule of Criminal Procedure 32(i)(B).  So I can now hear from counsel, government counsel, defense counsel, and the defendant if he wishes to address the Court.  I'm assuming we're not having anybody else speak.  Am I correct, government?

MS. ALOI:  Yes from the government's perspective.

THE COURT:  Defense counsel?

MR. DUCHARME:  Yes, Your Honor.  No one else.

THE COURT:  All right.  Let me hear from the government.

MS. ALOI:  Thank you, Your Honor.  The defendant, Charles McGonigal, supervised national security operations for the FBI in New York.  He was the special agent in charge and he sold his badge for $225,000.  He took that much money in cash from a businessman and former Albanian government official. Your Honor, this is the stuff of lore.

The first payment happened in a parked car outside an Italian restaurant in the Bronx.  And after getting the money, the defendant, while supervising the New York field office, took acts at that businessman's behest, and to the benefit of other individuals, and lied to the FBI about it, not once disclosing his relationship or the fact that he took the money, despite his clear obligation to do so.

This is at its core corruption that undermines transparency

1    and trust in the integrity of the executive branch of
2    government.  And it occurred at a time in our history when trust
3    in our government was and continues to be of utmost importance.

4        The defendant was sworn to investigate and prevent crimes
5    against the United States, not perpetrate them.  For this
6    egregious violation of the public trust the court should
7    sentence the defendant at the top of the applicable guidelines.

8        Now, I want to spend a few minutes going through the 3553
9    factors.  This court must consider the nature and circumstances
10   of the offense in imposing its sentence.  Quite simply, the
11   nature and circumstances of the offense are outrageous.  I'm not
12   going to spend a lot of time going over the conduct.  It's
13   detailed at length in the government's papers.

14       The defendant retired from the FBI in a senior role and
15   held one of its most important national security positions.
16   At exactly the same time he was supervising his fellow law
17   enforcement officers, he was concealing from his colleagues and
18   the public the fact that he had taken hundreds of thousands of
19   dollars in cash from a former foreign official.

20       He claims to have done this in anticipation of retirement
21   with an eye towards future business.  The defendant flew all
22   over the world on the FBI's dime, taking meetings with foreign
23   officials without telling the Bureau.  The fact that he might
24   have done so to advance his private interests does not make it
25   any better or otherwise justify or excuse his conduct.

1    This court must also consider the history and

2    characteristics of the defendant when it's imposing its

3    sentence.  Here, the history and characteristics of the

4    defendant too support a sentence at the top of the guidelines

5    range.  It is precisely because the defendant was one of the

6    highest ranking federal law enforcement officials in the United

7    States that his conduct was so outrageous.

8        Now, the defendant has asked the Court in its memo -- in

9    his memo, to consider the fact that this past November he met

10   with several components of the Justice Department to answer

11   their questions.  He did do this.  And the defendant correctly

12   represents that the department found him to be truthful that

13   day.  But the fact that the department even had to have those

14   meetings at all shows the extent of the damage caused by the

15   defendant's conduct.

16       The defendant has submitted to the Court a laundry list of

17   matters that he has worked on.  Nobody disputes that he held a

18   senior and sensitive role at the FBI.  Given that role, the FBI

19   has been forced to undertake substantial reviews of numerous

20   other investigations to ensure that none were compromised during

21   the defendant's tenure.  His lack of credibility as revealed by

22   the conduct in this offense could jeopardize them all.

23       The debriefing that took place was part of that internal

24   review, and it is a reason that this court was correct to find

25   the three-point enhancement for substantial interference with

the administration of justice.  And when the department asked

to speak with the defendant a second time, he declined to do so.

In addition, unlike many white-collar defendants who appear

before this court, the defendant is a repeat offender, having

been recently sentenced in New York for unrelated offenses he

committed after leaving the FBI.

I want to note something about that.  The defendant argues

that he has been "prejudiced" by the fact that the government

did not resolve the charges against him in one proceeding.  I

want to remind the Court that it was the defendant and not the

government who chose to commit two different crimes in two

different jurisdictions over two different time frames.

It is not prejudicial to the defendant to hold him

accountable for his own misconduct.  And it is the defendant

and not the United States that should not be allowed to play

games with the sentencing guidelines because he decided to

plead guilty in both jurisdictions.

It is appropriate for this court to consider all of his

misdeeds because they show he did not commit a single aberrant

act, but rather engaged in a sustained pattern of crime for

multiple years.

This court must also consider the seriousness of the

offense and promotion of the rule of law.  Given the seriousness

of the defendant's crimes and the audacity to commit them as a

law enforcement officer, the maximum guidelines sentence is

necessary to promote the rule of law, to provide just

punishment, and to provide adequate deterrence, both specific

and general.

As to specific deterrence, given he was so easily bought

and a repeat offender, a significant sentence is warranted to

provide adequate deterrence.  This defendant will not lose the

confidential information or tradecraft he specialized in through

his years with the FBI following his release from incarceration.

General deterrence is also critical when it comes to crimes

of deceit such as this one, because they are calculated

offenses, not committed, for example, in the heat of passion.

They are prime candidates for general deterrence.

This is especially true in corruption cases where there is

abuse of the public trust.  This court must send a clear, strong

message to the public and other would-be offenders that

violations of the public trust cannot and will not be tolerated.

Now I want to just say a few things about sentencing

disparities here.  There is no reason for this court to depart

down or impose a variance because of -- to avoid unwarranted

sentencing disparities.  §3553 invites the Court to consider

sentences imposed in factually similar cases.  And as the cases

highlighted by the defendant show, there are no factually

similar cases to this one.

The defendant asks the Court to find guidance in a 12-month

incarceration that was imposed in *United States v. Saffarinia*.

But there are clear distinctions in the underlying conduct.
In *Saffarinia* an assistant inspector general at HUD was
convicted for repeatedly failing to disclose over $175,000 in
loans he received from a personal friend.

But Mr. McGonigal received more money and did so not from
a personal friend, but from a person with ties to a foreign
government, at the same time he was overseeing national security
matters involving that government.  The stakes are much higher
under those circumstances, with a heightened need for
transparency.  The defendant also asks the Court to look to
*Cisneros* for guidance.  But that case involves a misdemeanor.

THE COURT:  You have to slow down a little here.

MS. ALOI:  I apologize.

*Cisneros* involves a misdemeanor, and it was not a law
enforcement officer charged with enforcing the very laws he was
violating.

In neither case the defendant points to were either of
those defendants repeat offenders.  Mr. McGonigal is.

Mr. McGonigal's 20 years of federal service is not
mitigating; it's aggravating.  His lack of credibility and
candor have jeopardized everything he did as an FBI agent.  Not
one of the other cases cited by the defendant involve a senior
law enforcement officer or clandestine $225,000 cash payments.

The government also took a look at sentences in the last
five years for which data was publicly available.  For

defendants in criminal history category II, the average period

of imprisonment for sentences involving the administration of

justice imposed --

THE COURT:  You need to slow down.

MS. ALOI:  Thank you, Your Honor.  So we took a look

at some comparable sentences in the data that the Sentencing

Commission publishes.  For defendants in criminal history

category II, like this defendant, the average period of

imprisonment for cases involving the administration of justice

imposed under 2J1.2 was 23 months.  And for sentences involving

bribery imposed under 2C1.1 was 38 months.  Given that, the

government's request for 30 months is entirely in line with the

data.

The defendant has also suggested that his sentence should

run concurrent with that imposed by the court in New York.  And

I want to remind the Court that he committed two different

crimes under very different circumstances.  The offenses are

completely different.  One involved a violation of the public

trust while he was in the FBI.  The other involved his conduct

as a private citizen.

And although this court has the discretion to impose the

sentences concurrently, or consecutively, in whole or in part,

the Court must specifically punish this offense considering the

3553 factors before you today.

It would be a windfall to this defendant to run the

sentences concurrently simply because both New York and D.C. caught the two separate crimes at the same time.  The sentence should run consecutively.

Your Honor, just to wrap things up here, lots of defendants have loving and supportive families, and many defendants have a history of service to their communities.  And no doubt this one does as well.  He is not unique or special in that respect. None of that is mitigating when you consider what he did.  He put his own greed above service to his country.

He took hundreds of thousands of dollars from a former foreign security official.  He took acts in office that appeared to be at the behest of that official.  He went so far as to open a criminal investigation based on allegations provided by that official that later proved to be baseless.  And he did all of this while lying to the FBI.  Such behavior must be punished to the fullest extent.  The government asks the Court to impose a sentence of 30 months.

THE COURT:  You asked for a fine, and I was trying to figure out in terms of what -- I know that the New York court imposed a fine of 40,000.

MS. ALOI:  Yes, Your Honor.

THE COURT:  40,000 I believe is the fine they requested there.  I believe you were requesting a fine in this case as well?

MS. ALOI:  Yes.  We are requesting a fine at the top

1   of the guidelines range of $95,000.  The probation officer has

2   requested a higher amount.

3           THE COURT:  I spoke to her.  It's based on other --

4   we didn't get a lot of information since he didn't sign the

5   release.  So we don't have a great deal of information.  But

6   let's assume from your perspective you're doing a 50 months and

7   then you're asking for another 30 months.  He obviously isn't

8   going to be working.  Do you have something that indicates that

9   he's going to be able to pay a fine of 95,000?

10          MS. ALOI:  Yes, Your Honor.  His financial history

11  is detailed at length in the final PSR, and he has significant

12  resources from which to draw on for the fine.

13          THE COURT:  All right.  Let me hear from defense

14  counsel.

15          MR. DUCHARME:  Thank you, Your Honor.  I'm going to

16  resist the temptation to repeat anything we've said in our

17  submissions.  I trust you've read them from your opinion and for

18  other reasons.  The way we're going -- I'd like to approach this

19  today, Your Honor, is my colleague Ms. Maloney has some brief

20  remarks on behalf of Mr. McGonigal, and then I'd like to respond

21  to some of the points made by the government, also very briefly.

22  So with the court's permission, Ms. Maloney.

23          THE COURT:  Okay.

24          MS. MALONEY:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.

1          MS. MALONEY:  As Mr. Ducharme mentioned, I'll briefly

2     address two of the sentencing factors -- the history and

3     characteristics of the defendant, and the need for just

4     punishment -- both of which warrant a substantially below

5     guidelines sentence in this case, and in any case, a sentence

6     should run concurrent with the sentence imposed against him in

7     New York.

8          In *U.S. v. Rita*, Justice Stevens observed that a

9     defendant's history of public service is something that the

10    court can consider at sentencing.  And there's no question that

11    Charlie's over 22 years of service with the FBI is worthy of

12    careful consideration today.

13         In his early years as a line agent in New York City, he

14    investigated suspected terrorist attacks and played an

15    instrumental role in preventing at least one attack on the New

16    York City subway.  He spent four months in Tanzania, digging

17    through the rubble at the site of the embassy bombing --

18         THE COURT:  You need to slow down.  This has been a

19    long day for the court reporter.

20         MS. MALONEY:  Sorry about that.

21         THE COURT:  And also for us and for me to absorb the

22    information.  Go ahead.

23         MS. MALONEY:  He also helped track down a confessed

24    child rapist and murderer after a five-day manhunt near his

25    hometown in Ohio.  He had just left for paternity leave when

the devastating attacks on 9/11 took place, and he spent the
following weeks helping out at Ground Zero with recovery and
cleanup efforts.  It was through these years of hard work, often
at the expense of his personal life, as detailed in his wife's
letters to Your Honor, that he worked his way up to one of the
highest ranking national security positions in the United
States.

As Your Honor knows, we are not able to discuss many of his
contributions due to the sensitivities in open court today, nor
was the probation officer able to review the classified addendum
to our sentencing submission in recommending an additional
custodial sentence.

The probation department wasn't able to review all of the
mitigating evidence at play here due to the clearance issues,
and we believe that if they had, the recommendation may have
been different.

To be clear, Your Honor, Charlie's history of service
doesn't excuse the conduct that brings him here today.  But
under 3553(a) it is a factor that the Court must independently
consider.  As Judge Rakoff wrote in *U.S. v. Adelson*, "If ever
a man is to receive credit for the good he's done, it should be
at the moment of his sentencing when his very future hangs in
the balance."

Charlie's service to the United States is an integral part
of who he is as a person, and the length and significance of

1  that service justifies leniency today.

2      Section 3553(a) also requires the Court to consider the

3  need for the sentence imposed to provide just punishment for the

4  offense.  Not unlike many defendants who have stood before you,

5  Charlie has already faced the consequences of his actions,

6  including the loss of two jobs, his reputation, and his

7  relationships with many family members and friends.

8      But in contrast to most defendants who've stood before Your

9  Honor, those consequences have been felt far more keenly in this

10  case than in most due to the extraordinary level of media

11  attention and frankly public frenzy that this case has achieved.

12  As a result of this, Charlie's been demonized for far more than

13  the conduct that he pleaded guilty to.

14      Even more concerning is the impact that this negative media

15  attention has had on his family, particularly his wife and his

16  24-year-old daughter, who've become the target of personal

17  harassment on social media and in the news.  An additional

18  custodial sentence will only wreak further havoc on the

19  McGonigal family when other options are more appropriate here.

20      Finally, Your Honor, with or without an additional term of

21  imprisonment in this case, Charlie will serve a 50-month

22  sentence that was imposed against him in the New York case.  And

23  it's clear from the record in that case that Judge Rearden did

24  consider his D.C. conduct in imposing a very substantial

25  sentence, which was actually higher than the 42-month sentence

1   recommended by the probation department.

2       It's also worth noting that had Charlie been allowed to

3   consolidate these cases, as he requested, his guidelines range

4   for the consolidated case would have been the same range that

5   was applied to him already in New York.  The government's

6   refusal to consolidate these cases has resulted in significant

7   prejudice to Charlie which can be remedied today by this court's

8   sentence.

9       For all of these reasons, Your Honor, we respectfully

10  submit that when this case is viewed holistically, the 50-month

11  sentence already imposed against Charlie is sufficient but not

12  greater than necessary to serve the ends of justice.

13              THE COURT:  All right.

14              MR. DUCHARME:  Thank you, Your Honor.  I'm just going

15  to briefly respond to a few of the points raised by the

16  government.  And then I expect Mr. McGonigal would like to

17  address you personally.

18              THE COURT:  All right.

19              MR. DUCHARME:  Thank you.

20      So, Judge, we've endeavored through our submission and will

21  continue to endeavor to illuminate the facts and the law that

22  matter.  It's in Mr. McGonigal's interest, and frankly I think

23  it's in the public interest for the -- for people to understand

24  and for you to fairly judge Charlie for what he did, which is

25  serious, but not for some of the speculation and inference which

1    has been invited upon him.

2        He pled guilty to a violation of 18 U.S.C. 1001.  That's a

3    serious offense.  The crime was omitting information from

4    government forms, financial disclosure forms and travel forms,

5    and that's important.  The statement of facts, which is in the

6    record in this case, makes clear that the main reason he was

7    doing that was to avoid scrutiny for launching his private

8    sector career before he left the government.  He shouldn't have

9    done it, it's serious, and he's accepted responsibility.

10       But, respectfully, Your Honor, this is not the stuff of

11   lore.  This is not the Robert Hanssen case.  I could forgive the

12   public if they were to misunderstand the offense conduct in this

13   case because the government has said things like he betrayed his

14   country.

15       Now, Charlie takes this very seriously, but there should be

16   a measured response from the Court.  Not every case is the stuff

17   of lore and not every case involving an FBI agent is the Robert

18   Hanssen case.

19       Now, on the New York-D.C. piece, Judge, just to be

20   pragmatic about this, of course there was a venue in both

21   districts.  The government of course can prosecute him in both

22   places.  It was a ruthless litigation strategy because it buried

23   us in discovery and it took us a while to get to a point where

24   Charlie could quickly agree to accept responsibility.  But they

25   can, of course, do it.

The point is that Charlie has always been ready to accept responsibility for what he's done.  And having to appear in both districts, we tried to cabin them off.  Let's make the New York case about New York and the D.C. case about D.C.  And despite our efforts, in New York the judge seems to have clearly considered this conduct.  And what we're trying to avoid is a person being punished twice for the same thing.  It's as simple as that.

You certainly can consider any relevant fact to sentencing. We accept that.  But we would urge you not to punish him twice for the same relevant conduct relating to overlapping periods of time.  The cases involve some of the same witnesses, overlapping arguments have been made by the government in both cases.  But we trust you will see through that to what really matters here: what he did and will the punishment fit the crime.

There aren't a lot of cases like this.  I think the *Saffarinia* case is actually pretty close.  Same types of charges, similar conduct, government official.  But there's some important distinctions, and Ms. Maloney alluded to them.

But a big difference here is that Charlie swiftly accepted responsibility.  He did go in for a seven-and-a-half-hour interrogation by the government.  They found him truthful.  And it's perplexing to me that they don't want to acknowledge that there's even some slight mitigation value in that.  It also somewhat offends me that they would raise the fact that he

1    declined a later invitation to interview by exercising his right

2    to remain silent.  I don't expect you to hold that against him,

3    and I don't expect that the government would really urge you to

4    do so.

5         Addressing it briefly, it was a collateral issue brought to

6    our attention late in time with conditions on the interview that

7    were unacceptable to Mr. McGonigal.  But I think he deserves

8    some consideration for coming in and trying to help the

9    government sort out issues that it was dealing with.  And you

10   know that's perilous when a defendant agrees to do that.

11        On his history, Judge, it's not about the titles.  We're

12   not relying on any title that Charlie McGonigal held to say to

13   you, because he was the SAC he should get a break.  It's what he

14   did.  Because what he did is who he is.  And you have a really

15   detailed understanding of the courageous things that Charlie did

16   on behalf of the United States of America.  And of course under

17   3553(a) you can consider those things.

18        So on the one hand, I agree with many of the points that

19   the government has made.  Of course it's aggravating that he

20   held a position of public trust.  Of course it's aggravating

21   that it's created doubt about things he may have been involved

22   in.  But that can't cancel out the mitigating factors that are

23   also essential under 3553(a).

24        And he's entitled, I think, to at least just a little bit

25   of consideration for how he's conducted himself in responding to

this case and to the government by immediately agreeing to plead guilty, by trying to assist the government, and by presenting himself here before you.  And you'll hear from him directly.

On the issue of tradecraft and general deterrence and specific deterrence because he's a sophisticated player at tradecraft.  He is, but we haven't seen any sophisticated tradecraft, frankly, Judge, in this case or in the New York case, for that matter.

Using WhatsApp and failing to fill things out on forms, taking personal travel, it's run-of-the mill criminal stuff. So there's no reason to fear, based on anything we've seen in this case, that Charlie's tradecraft poses some great threat to the United States.

Respectfully, he didn't betray his country, he broke the law, he should have filled out the forms completely and truthfully.  He didn't.  He wanted to launch his private sector career before he should have.  He's paid the consequences dearly, and he's already looking at 50 months of incarceration based on the New York case.

And with that, Judge, unless you have any questions for me, we'll rely on our submission.

THE COURT:  The recommendation from you is that one to seven months, which obviously is a major variance.  So what are the grounds for the variance, because it doesn't get a departure.

MR. DUCHARME:  Well, Judge, I feel a little sandbagged

1    by the argument for consecutive time from the government today.

2    Because if we were talking about concurrent time, I mean, let's

3    be honest, it wouldn't make a meaningful difference to

4    Mr. McGonigal.

5        The guidelines is the starting point, clearly.  But if you

6    look at the universe of 1001 cases, which is what this is, it's

7    very hard to find a case where a substantial term of

8    incarceration has been imposed, even on comparable conduct,

9    without some of the mitigating information.

10       There are terrorism cases where substantial time was

11   imposed.  But when you're looking at this offense conduct,

12   omitting financial information, travel information from forms,

13   it's very hard to find a case.

14       So, Judge, we respect your opinion, you've laid out your

15   analysis on the appropriate guidelines range, our argument to

16   you is that Mr. McGonigal does not need additional time in jail

17   beyond the 50 months imposed by the court in New York to serve

18   the ends of justice.

19       He is deterred, he is punished, and so we are asking for a

20   reasoned sentence, cognizant of the guidelines, cognizant of the

21   body of case law and precedent in 1001 cases, recognizing some

22   of the mitigating information, and the strange reality of this

23   case where you're inheriting a case where some of the conduct

24   was already considered by another district court.

25                 THE COURT:  Well, it's not that unusual to have a case

where some other judge has done the sentence.  But he gave this

in New York and he came up with his own reasons for doing it in

terms of whatever -- you know, looking at the transcript.  But

what you're asking for basically is a concurrent sentence that

would leave him with basically a sentence of 50 months.  Because

you're using -- although you don't want to use the New York

case; on the other hand, you do.

So the question that I still have is, looking at it from

this case -- forget New York -- looking at just this case, what

is the basis for one to seven months?  That's an extraordinary

variation from 24 to 30 months.

MR. DUCHARME:  It is an extraordinary variation from

24 to 30, but it's consistent with other sentences in 1001

cases, Your Honor.

THE COURT:  True.  But there are very few 1001 that

would have the -- I mean, the *Clinesmith* frankly is probably the

closest as far as I can see, although they're all slightly

different.  I think in this particular area there isn't -- you

don't get one that you can match up specifically.  And that's

not that unusual.  But I think in this particular area, probably

more so, in terms of who the individuals are, what positions

they had in order -- that they did not report it.

Obviously, the higher you are in your ranking, the more

you're expected to be able to follow through with what your

requirements are.

1              MR. DUCHARME:  Yes.

2              THE COURT:  And more of a black mark is for whoever

3     you work for in terms of doing it.  So I'm still trying to

4     figure out the basis of your variance.

5              MR. DUCHARME:  Well, *Saffarinia* has been our guiding

6     star on this.  *Saffarinia* had frankly very comparable conduct,

7     and the sentence was 12 months and a day after trial.  So if

8     you're trying to avoid an unwarranted sentencing disparity on

9     similar conduct --

10             THE COURT:  What's similar in that case?

11             MR. DUCHARME:  Well, you had similar charges, 1001,

12    1519 --

13             THE COURT:  I know, but what else?  It's obviously the

14    same charges but what else --

15             MR. DUCHARME:  You had a $90,000 loan from a neighbor.

16    You had efforts to conceal.  You had a position of an assistant

17    inspector general, certainly a position of public trust.

18        So I guess from our point of view, Judge, if you look at --

19    if you consider that *Saffarinia* is at least a relevant starting

20    point for some consideration, what is worse about this case and

21    what is better about this case.  Presumably had Saffarinia

22    quickly pled guilty and accepted responsibility and had three

23    points off for --

24             THE COURT:  There's quite a difference between the

25    amount of money that we're talking about there than you are

1   here, among other things.

2          MR. DUCHARME:  Yeah, that's right, Judge.  But there's

3   also the fact that the $225,000, you know, the government has in

4   the statement of facts made clear it was essentially a business

5   loan.  It was not repaid, but it's not exactly the same.  I

6   think that the statement of facts makes clear that there was a

7   bad idea between Mr. McGonigal and his friend, that they were

8   going to use his network in the last few months before his

9   retirement to try to get their business off the ground.

10         And that's clearly wrong, and it's serious, but it's not,

11   from our point of view, as serious as the conduct that would

12   typically result in a 24 to 30 months sentence which, as you

13   know, we're importing the guideline for obstruction of justice

14   because the elements overlap.  And we recognized your opinion on

15   that.  But 24 to 30 months, Judge, is a high starting point.

16         So the way we get below 24 is we look at his acceptance of

17   responsibility, we looked at some punishment already imposed, we

18   looked at the mitigating factors of his prior work for the

19   United States, his efforts to cooperate, and the landscape of

20   other 1001 cases.  That's how we get there, Judge.

21         THE COURT:  Okay.  All right.  I don't have any other

22   questions.

23         MR. DUCHARME:  Thank you, Your Honor.

24         THE COURT:  If Mr. McGonigal would like to address the

25   Court, he can.  I do of course have your letter.

1            THE DEFENDANT:  Thank you, Your Honor.

2       Good afternoon.  Thank you for giving me the opportunity to

3   appear and speak before you today.  As you can imagine, this

4   situation and entire process has been very painful, both

5   mentally and physically exhausting, not only for me but for my

6   wife as well as my children, my family, my friends, and I have

7   many of them.

8       I'm feeling this way in reflecting on my actions.  I stand

9   before you today with a deep sense of remorse and sorrow for my

10  actions.  I fully acknowledge the mistakes I have made, and I

11  appear before you taking full responsibility for my conduct and

12  actions.

13      In taking responsibility for my actions and reflecting on

14  my situation, I recognize the pain, suffering and disappointment

15  I have brought on myself, my wife, my family, my friends, and my

16  former colleagues at the FBI.  And for this I am deeply sorry.

17      During my time of reflection, I have developed a better

18  appreciation for changes I need to make to be a better person.

19  I recognize more than ever that I betrayed the confidence of

20  trust of those closest to me, and for the rest of my life I will

21  be fighting to regain that trust in becoming a better person.

22  In reflecting on my conduct, I fully recognize where I went

23  astray and how my actions solely have brought me before you

24  today.

25      Your Honor, I am humbly asking for a second chance to prove

to those I've caused pain, suffering and harm, and to this court, I can and will continue to be a law-abiding member of society and a productive one as well.  I more than anyone know that I've committed a felony, and as a former FBI special agent, it causes me extreme mental, emotional, and physical pain.  Not to mention the shame I feel in embarrassing myself and the FBI, an organization I love and respect.

As you know, I have met with the government for approximately seven hours in an attempt to be helpful and to address any questions they have or had of me.  I felt that that was a good opportunity for me to display to them how serious I take these matters and how I did want to help them in addressing any gaps or concerns they had about my conduct.  In stating this, I am committed to focusing on being a better person, tending to my personal growth, and continuing to love and support my wife, family and friends.

I have sought counseling and spiritual support in bettering myself as a person.  I'm willing to take whatever steps necessary to assure you and this court that I can change and I can be a productive and sympathetic member of society going forward for the remainder of my life.  I am prepared to fully comply with the Court's decision and conditions and that I am remorseful in wanting to make things right.

Your Honor, I ask today for leniency in administering my sentence.  As you know, in what has been mentioned both by the

prosecution and my attorneys, I have already been sentenced

to 50 months' incarceration and fined $40,000.  I heard the

comments about our resources and financial situation, but, Your

Honor, to be frank, nobody is prepared for legal fees to this

level, two trials, and the expenses that come along with that

for a family trying to raise two children as a retired

government employee.

Not only that, if I go to prison, which I'm planning to do

in another month, I will not be earning an income, and my wife

and family will be left to provide on their own while I'm

incarcerated.  So it does create a significant financial burden,

albeit I live in New York City and may have some resources.

I am prepared to take the consequences for my action and

will take the necessary steps to live a respectful and

responsible life going forward.  I want to take this

opportunity, Your Honor, to thank you for your treatment of me

during this process, the prosecution, and also special thanks

to Mr. Seth Ducharme and Meagan Maloney and Bracewell for

representing me.

Thank you for your consideration.

THE COURT:  All right.

In addition to the advisory sentencing guidelines, the

Court considers the pleadings, arguments and record in this

case, in addition to the following information, in determining a

fair, appropriate, and reasonable sentence, in conformance with

the factors set out in 18 U.S.C. 3553(a) and subsequent sections except for (e).  Mr. McGonigal is 55 years old.  In terms of criminal history, he has only the one conviction in New York, for which he, as we've noted, received the 50 months sentence of incarceration plus a fine of 40,000.

In terms of education, he has a bachelor's degree in business administration, specifically finances.  He self-reports a master's degree in government and international studies from Johns Hopkins University, also self-reports a master's degree in government and international studies from Johns Hopkins. And he's certainly completed several law enforcement training programs.

In terms of a job history, 1993 to '96 he was an auditor for a French Canadian bank.  From '96 to 2018 he was a special agent with the FBI in New York, then in Cleveland, in their field offices, supervisory in D.C. headquarters, 2016 as special agent in charge of counterterrorism division in New York, participated in several very high level classified and unclassified cases.

After retirement in 2018 to 2023, he was the head of global security at two firms.  The legal problems resulted in terminations of those arrangements.  2022 he's a partner in Guardian Consultants, a security company in New York.  The company as I understand it has 200 employees.

Financial conditions.  The one issue and I would recommend

recently, it appears that -- I don't know whether it's counsel doing this or who, but defendants are not filing consent forms. So they're not filing consent forms so that the Court gets as much information as they might.  It is not useful, because frankly, what happens is we fill in the blanks.  So if you don't put some things in there, we don't get it.

The other aspect of it, and I realize that having another interview when you just had one not that long ago in the New York case with the probation office is one thing.  I think it would have been helpful to have had the interview here instead of totally relying on the probation officer there, who came to whatever conclusions they did in terms of this.

I am not holding it against you; I'm just saying to you that sometimes it's more valuable and it might be of assistance. So these are not things that I'm going to, you know, give you a demerit for, but I'm just pointing something out that recently has been happening which I think is not useful, frankly, for the defendant.

In terms of the financial, as I understand it, he does have retirement savings.  Even with the liabilities that he has, there is certainly cash flow.  It does appear, based on the information that I have, that he does have an ability to pay a fine.  I'm ultimately not going to impose one, but I do think he has the ability to pay it.

Substance abuse, mental health.  There are no drug issues.

There had not been alcohol use reported.  However, it has been raised by counsel and I did receive a letter from someone that he is receiving some counseling with.  In paragraph 84 there does an indication of what the anxiety has basically resulted in in terms of how he's handling issues, etc., but it would have -- and he self-reported engaging in these sessions of talk therapy.

Again, it would have been helpful to have had a discussion with the probation officer about this.  But I will credit the treatment letter that I received from the individual who evidently is providing whatever the talking therapy is in terms of dealing with the issues and the strains and pressures obviously of these two cases.  So I now have verification.  I didn't originally.

In terms of physical condition, there appear to be no issues for the Court to consider.

On a personal basis, some of this is unverified, some of it's uncorroborated by the D.C. probation office, but relied on in terms of whatever was in the New York presentence report. But Mr. McGonigal was born into an intact union.  His father is a retired steel worker, his mother a homemaker who died in 2017. His parents divorced in the late 1990s or 2000.

He has three siblings, a sister and two brothers. A brother is employed, sister is married and a homemaker. The sister particularly appears to be very supportive, has a relationship with their father that the defendant doesn't

communicate with him very often, which may be part of his job.
I don't know.

Defendant married in 1994.  His wife is a supervisory
program analyst at the U.S. Department of Transportation,
Federal Highway Administration.  There are two children,
daughter age 23 and a son 21 in college.  Because of the
interests of this case, I'm not going to give any more personal
details.

In terms of the statement of offense, there is an
anonymized version, which is what I'm going to read.  There is
one that is an unredacted version which I always do to make sure
that we all agree on who everybody is when you sign it.  So in
terms of the statement of offense which I'm going to read as
opposed to trying to summarize it:

The United States Department of Justice is a department
within the executive branch of the U.S. government.  The FBI
is the principal investigative arm of the U.S. Department of
Justice and is a national security organization with both
intelligence and law enforcement responsibilities.

Mr. Charles McGonigal was a special agent in charge of
the FBI's New York field office from October 2016 until his
retirement from the FBI on September 14, 2018, and during that
time was a member of the Senior Executive Service.
Mr. McGonigal was responsible for overseeing counterintelligence
and national security matters as a special agent in charge.

As a special agent in charge of the FBI's New York field office, and a member of the SES, Mr. McGonigal had a legal duty to file an annual public financial disclosure report pursuant to the Ethics in Government Act of 1978.  The financial disclosures were made on an Office of Government Ethics form, the purpose of which, 1, was to foster transparency, trust and confidence in the integrity and decisionmaking of the executive branch, to assist public employees and their agencies in avoiding actual or apparent conflicts of interest between official duties and private financial interests.

Filers were required to accurately disclose to the public, among other things, income, assets greater than a thousand, liabilities over 10,000, gifts and travel reimbursements and other financial transactions.  Information provided on the form could result in employment action being taken against the filer. They were submitted, these forms, electronically, routed to the FBI headquarters in Washington.

Mr. McGonigal had a duty and was required by the FBI policy directives and the FBI policy generally to report accurately to the FBI any unofficial foreign travel and any ongoing professional or official contacts with foreign nationals.  And he was also required to report accurately official foreign travel to the FBI.

The official and unofficial travel disclosures were required to be made on an FBI report of foreign travel forms

and the FBI foreign travel debriefing forms, which were submitted electronically and then again routed to the FBI headquarters.  The disclosures of contacts with foreign nationals were required to be made on an FBI report of foreign contact forms.  Information provided on the various forms had national security implications and could result in employment action, including revocation of security clearances where appropriate.

As the holder of a national security clearance, Mr. McGonigal was required to report to the FBI accurate and complete information relating to his contacts with foreign officials, and his financial assets and liabilities.

Person A was a naturalized U.S. citizen who was born in Albania and who resided in New Jersey.  Person A was a professional acquaintance and a potential business partner of Defendant McGonigal.

Company A was a Delaware business organization registered by Person A in January of 2018.  Person B was an Albanian national who was employed by a Chinese energy conglomerate. Person B operated as an informal advisor to the prime minister of Albania, retaining an official Albanian government email account and passport, and was a former Albanian senior government official.  Person A and Person B were friends and business associates with each other.

In the fall of 2017, in anticipation of his retirement

from the FBI, Mr. McGonigal and Person A discussed a prospective joint business venture, including the formation of a private company providing consulting services.  During the relevant time frame, Mr. McGonigal knew that it was improper to engage in personal business development efforts without disclosing these activities to the FBI.  Mr. McGonigal requested a loan from Person A.

On September 5, 2017, Mr. McGonigal submitted one of the forms to the FBI for upcoming "unofficial travel to Albania." The submission improperly failed to, 1, identify that Person A would be a travel companion, B, state that lodging and accommodations would be provided free of charge and who would be paying for them, and C, state that Mr. McGonigal would be traveling to Kosovo in addition to Albania, and D, identify any anticipated reportable foreign contacts including Person B or any other foreign national with whom defendant Mr. McGonigal had an ongoing relationship.

On September 7, 2017, Mr. McGonigal traveled by air with Person A from the United States to Albania, where over the next several days they met with Person B and other foreign nationals. Neither Mr. McGonigal nor the FBI paid for Mr. McGonigal's lodging while in Albania.

On September 9, 2017, in Albania, Mr. McGonigal met with Person B and the prime minister of Albania.  At the request of Person A, Mr. McGonigal cautioned the prime minister of Albania

to avoid awarding oil field drilling licenses in Albania to
Russian front companies.  Person A and Person B had a financial
interest in the government of Albania's decisions about awards
of oil field drilling licenses.

Mr. McGonigal gave an FBI hat to the prime minister of
Albania in the presence of Person B as a gesture of appreciation.

In September 2017, in Albania, Mr. McGonigal was introduced
by Person A to an Albanian business person and politician who
told Mr. McGonigal that he wanted the United States government
to investigate an alleged plot to kill the Albanian business
person and politician.

On September 10, 2017, Mr. McGonigal traveled by car from
Albania to Kosovo, along with Person A and others, where
Mr. McGonigal met with and provided an FBI hat to a Kosovo
politician.  Shortly after this trip to Kosovo, which had the
dual purpose of collecting information that was potentially
useful both to the FBI and Mr. McGonigal's own undisclosed
personal business development plan, Mr. McGonigal and Person A,
traveling together, returned to the United States.

Following his September travel to Albania, Mr. McGonigal
maintained an ongoing relationship with the prime minister of
Albania and Person B.  On October 5, 2017, outside a restaurant
in a parked car in New York City, Mr. McGonigal received
approximately $80,000 in cash as part of the loan he had
requested from Person A.

In the fall of 2017, Mr. McGonigal twice more received cash loans from Person A in the amounts of approximately 80,000 and 65,000.  Mr. McGonigal has never repaid the loan he received from Person A, and the loan did not have any terms or conditions attached to it.

On October 16, 2017, Mr. McGonigal submitted the FD-772B form regarding his September travel to Albania and Kosovo.  The submission improperly failed to disclose that Mr. McGonigal had met with the prime minister of Albania in Albania and with a Kosovar politician in Kosovo, and falsely denied that Mr. McGonigal had disclosed his employment to a foreign national outside of his official FBI business.

On November 15, 2017, Mr. McGonigal submitted an FD-772 form for upcoming "official" travel to Austria.  The submission improperly failed to, A, identify that Person A would be a travel companion, B, identify that any lodging or accommodations would be provided free of charge or who would be actually paying for them, C, state that Mr. McGonigal would be traveling to Albania in addition to Austria, and D, identify any anticipated reportable foreign contacts.

On November 17, 2017, Mr. McGonigal traveled by air to Austria.  On November 18, 2017, Mr. McGonigal and another representative of the Department of Justice met and interviewed the same Albanian business person and politician Mr. McGonigal had met during his September 2017 trip.  Person A attended the

meeting as an interpreter.  Mr. McGonigal did not prepare a standard FBI Form 302 report for the interview, and the FBI has no official record of it taking place.

On November 18, 2017, after the meeting described above, Mr. McGonigal and Person A traveled by air from Austria to Albania where they met again with the same Albanian business person and politician, this time without the participation of the other DOJ official.  The Albanian business person and politician discussed business opportunities with Mr. McGonigal and Person A.

On November 21, 2017, Mr. McGonigal traveled by air from Albania to Austria and then returned to the United States.  Neither Mr. McGonigal nor the FBI paid for his lodging while he was in Albania.

On November 25, 2017, Mr. McGonigal informed the Department of Justice of a potential new criminal investigation involving a U.S. citizen who had registered to perform lobbying work in the United States on behalf of an Albanian political party, different from the one in which the prime minister was a member.  One day earlier he had received information from Person B about the U.S. citizen lobbyist.  Mr. McGonigal passed this information along to the Department of Justice.

In December 2017, Mr. McGonigal dined in Washington, D.C., with Person A and Albanian government officials, and dined in New York City with Person A and the prime minister of Albania.

There were no political discussions at dinner.

On January 22, 2018, Mr. McGonigal submitted the FD-772B form regarding his November travel to Austria, referenced above. The submission improperly failed to disclose that Mr. McGonigal had traveled to Albania as well as Austria, or that he had met with either Person B or the prime minister of Albania, or that he had disclosed his FBI employment to a foreign national outside of official business.

On January 22, 2018, Mr. McGonigal received information about the U.S. citizen lobbyist from Person A, and he forwarded the information to another FBI New York official who was his subordinate employee.  Person A had received the information from the office of the Albanian prime minister.

From February 21, 2018, through February 24, 2018, Mr. McGonigal traveled with Person A to Albania but he did not report the travel to the FBI as required, using the appropriate forms.

On February 26, 2018, the FBI New York office formally opened a criminal investigation focused on the U.S. citizen lobbyist, based in part on information provided by Mr. McGonigal at his direction.  Person A was later identified by the FBI New York office as a confidential human source supporting the investigation, and Person A provided information to the FBI New York office during the investigation.

Person B later helped facilitate a meeting between the FBI

New York office and witnesses located in Europe, by, among other things, paying for the witnesses' travel expenses.

Mr. McGonigal had not disclosed his financial relationship with Person A to the FBI, nor had Defendant McGonigal disclosed his ongoing contact with Person B as required, using the FD-981 form.

On March 4, 2018, Mr. McGonigal dined in Washington, D.C., with, among others, Person A, the prime minister of Albania, and a former FBI special agent who was working at an international professional services firm.

From April 26, 2018 through May 2, 2018, Mr. McGonigal traveled with Person A to Europe, including Albania, but did not report the travel to the FBI as required, using the appropriate forms.

On June 10, 2018, Mr. McGonigal submitted OGE 272 -- 278, excuse me, form, that improperly failed to include any information about the approximately $225,000 loan that he had received from Person A.

Between August 2017 and Mr. McGonigal's retirement from the FBI in or around September 2018, Mr. McGonigal did not report ongoing professional or official contacts with foreign nationals to the FBI as required, using the appropriate forms.

On May 6, 2019, around nine months after his retirement from the FBI, Mr. McGonigal submitted an OGE 278 form that improperly failed to include any information about the

approximately $225,000 loan that he had received from Person A
either as an asset or a liability.

In sum, beginning no later than August 2017 and continuing
until at least May 6, 2019, Mr. McGonigal concealed aspects of
his relationship with Person A that he had a duty to disclose,
created an actual and apparent conflict of interest between his
official FBI duties and his private interests, including that
Mr. McGonigal accepted $225,000 from Person A, traveled with
Person A to Europe, and established ongoing relationships with
foreign nationals introduced to him by Person A and Person A's
associates.

Now, looking at certain additional exhibits which basically
were letters of support I would consider.  Mr. McGonigal wrote a
letter.  He unequivocally accepted responsibility, expressed
remorse, as he has today, which is certainly a factor in
determining deterrence, deterring -- more of an issue for
deterring others probably than being concerned about that he
would do this again.

The defendant recognized the personal consequences of his
criminal actions, including not only for himself but his family
and those close to him.  Unfortunately, defendants don't
consider these before they engage in these actions and don't
realize that there are consequences to others.

I also received the transcript of the sentencing in New
York, a letter from a colleague hired by the defendant as a CPA,

and -- in which the individual who wrote the letter indicated the defendant was a mentor to him and to other colleagues. Highlights Mr. McGonigal's skills and accomplishments.  It was a very complimentary letter.

Another FBI colleague wrote that he knew the defendant for about 25 years professionally and personally, and also discussed Mr. McGonigal's many achievements.  Someone else who knew the defendant, an NYPD detective who was on an FBI Joint Terrorism Task Force, and after retirement continued in intelligence work with his own company, also very complimentary.

There were several friends who wrote complimentary letters. There was a G but I didn't see a letter there.  H was a friend in terms of discussing the defendant's activities and contributions to his homes, very complimentary, his neighborhood, his community in terms of his contributions, more in that relationship than in terms of his official work.

Another friend spoke of his compassionate role when this individual had suffered a family loss.  Other friends who know Mr. McGonigal for over 20 years discussed his positive attributes as well as his accomplishments.

Mr. McGonigal's wife also wrote a lengthy letter, certainly a testament to a loving and supportive relationship.  Recounts their lives together from the time they met until the present time.  Also provides some family background.  Also discussed the effect on the family in terms of the criminal charges, those

1    events, the negative media coverage which has resulted in

2    harassment personally and on social media, Facebook, Instagram,

3    over the last four years.  That's also evidently sought a

4    restraining order involving one specific person.

5         And certain friends and acquaintances have been supportive

6    but others have shunned Mr. McGonigal and his wife's company.

7    As I said, unfortunately, defendants don't consider before they

8    engage in the criminal acts the unintended consequences to those

9    close to them.  In this case it clearly has been his wife and

10    his two children.

11         This is a very serious offense in that Mr. McGonigal did

12    not disclose as required that he received the $250,000 from a

13    business person associated with the Albanian government, Person

14    A.  He advanced Person A's business interests, was introduced to

15    various officials in the Albanian government, lied knowingly to

16    the FBI about their joint activities, created an actual and

17    apparent conflict of interest between his official FBI duties

18    and his private interest, certainly abusing his position of

19    trust.

20         The defendant certainly has had a distinguished and

21    illustrious career in the FBI before he retired, both in terms

22    of looking at the materials that I was provided including the

23    classified supplement.

24         It appears at the end of his career that, contrary to all

25    of his accomplishments up to this point, Mr. McGonigal seems to

have lost his moral compass, by destroying his reputation,
destroying also and tarnishing, certainly, the FBI in terms of
their reputation as well.  By being in such a high position,
there was attention that there might not have been to somebody
in another position within the FBI.

So it's not only affected Mr. McGonigal, but frankly the
whole organization.  Breaching the public trust by his actions,
and it's a reflection, frankly, as I said, on the FBI as a
government agency that's entrusted to investigate the criminal
acts that Mr. McGonigal himself engaged in while an FBI agent.

And I think Mr. McGonigal knew that if he reported his
activities as he was required to do, to the FBI, they would not
have approved them, they would have considered them clearly a
conflict, and there could have been repercussions or negative
consequences to him, I think most likely.

In terms of looking at what possible motivation there
would be at the end of his career to take such steps that he
knew clearly were unlawful, the motivation could only be greed.
And frankly, and arrogance, that you could engage in these
activities and not report them and get away with it.

As I said, reviewing his cases in terms of what you've
engaged in to make sure that there weren't any issues, which
always happens in government agencies with positions of trust,
if you find that they have not been truthful in their
communications, you wind up having to go back and look through

1    other cases to make sure that there are no issues with it.

2    So it's a wider net than just Mr. McGonigal, his family; it also

3    affects the agency itself.  They're unwitting, but they're

4    certainly something that is affected.

5         And I would say that, you know, when you retired, that you

6    were -- leaving aside the fact that two of the positions you

7    wound up losing because of these criminal actions that came to

8    light, but you were able to find work in the security field,

9    intelligence, which you're interested in, at a handsome salary

10   before you were terminated.  Certainly these were well above

11   what you were making as a government employee.

12        So you were going to be able to make money sufficiently to

13   be able to support quite well yourself, your family.  And I

14   realize that having people in college is expensive, but I don't

15   understand frankly why you would simply throw away your career

16   at the end in terms of getting this money, taking a chance that

17   you wouldn't be found out, and hoping presumably that you

18   wouldn't be, when you frankly, if had you proceeded to retire

19   and simply gone out and got work like you did before this all

20   came to light, you would have had a very handsome, quite

21   lucrative salary without having done any of this.

22        And the New York case is the New York case.  And that

23   occurred after you left the FBI.  From my perspective, other

24   than noting what the sentence is, it's not something that I'm

25   going to consider.  I'm considering this case, which I consider

1    very serious.

2         Now, on the positive end, I do think Mr. McGonigal is

3    remorseful.  I think he recognizes that -- and has been

4    experiencing the negative consequences, and I think in terms of

5    not only himself but as well as to his family.  I think his

6    statement today and his letter, I accept that he is remorseful.

7    Unfortunately, it doesn't repair the damage.

8         He's accepted responsibility.  There's been no equivocation

9    in terms of what it is he agreed to, and the statement of

10   offense had a lot of details as I went through it.  He did enter

11   a plea, so certainly in terms of judicial resources and

12   government, prosecutorial resources and putting a case together

13   was not necessary.

14        I will take into account that you've had a distinguished

15   career with responsible actions in terms of involving national

16   security.  And I have some -- although we did not overlap, I

17   certainly am familiar with what the New York office on

18   counterterrorism did and that you headed.  So certainly that

19   can be considered.  And you very much have family and friend

20   support.  There are some who have not supported you but you do

21   still have it, and I feel that a support system is important in

22   terms of people keeping people going forward.

23        In terms of parity, it's difficult, frankly, to find a case

24   that's exactly like it, partly because of the high-level

25   position that you're in.  A lot of the other cases, certainly

they all involve government employees of one sort or another,
but they for the most part were not -- either not at that level
or didn't have the kinds of responsibility, or what they didn't
report was not at the level of the things you omitted.

So trying to look at other cases with government employees
was much more difficult.  I have looked at the ones that the --
both the government and the defense have reviewed.  I do keep
sort of a log myself of sentences, and none of it quite is a
cookie cutter for this particular case for a lot of different
reasons.

But obviously I'll consider and have considered the
factors, the seriousness of the offense.  I think there's
limited rehabilitation needs.  I think the New York judge did
recommend RDAP, which I think makes sense in terms of the,
evidently, therapy you're receiving at the present time.  I
think deterrence to you is probably more limited.  I don't think
you're going to have the opportunities to do the same kinds of
things, but I also think that you're sufficiently remorseful, I
don't think, if nothing else, you would not put your family
through this again.

And I think deterrence to others is significant.  I think
that is a very important in terms of people -- and I think it's
correct, the government's statement, that our institutions,
government institutions are getting tarnished by various
comments that people are making and activities that people are

engaging in, which is unfortunate in terms of proceeding along in a democracy where you want to make sure that your government institutions are acting lawfully and that are respected within the community.  So deterrence to others is a primary factor for me.

The judge in New York made his own decisions.  I'm going to make mine.  It will be based on the actions that you've taken here, not what you did in New York.  Obviously, what you did in New York does -- I've looked at it in terms of the sentence, not the facts that were involved with it.  I think the New York judge came to his own conclusions.

The sentence in New York is 50 months of incarceration. You're to report on March 18 to the Bureau of Prisons.  He did recommend the RDAP, the residential drug abuse program.  You have three years of supervised release.  You obviously have the $100 special assessment and the fine of $40,000.  Also I understand that you're forfeiting a sum equal to $17,500 in U.S. currency.

So one of the things to consider in this particular case is what the defense has asked for, which is for a variance, which is a substantial variance.  And I don't think in my discretion that I would apply it.  I don't think it is appropriate.  I think the conduct is too serious and the other factors under 3553.

I've taken into account the things that you have brought

1    up, but I don't think they rise to the level of a variance.

2    They do certainly, as I've indicated the positive aspects,

3    something that I've taken into account in fashioning a sentence,

4    but I don't think it's enough for a variance.

5        So then the next question really is whether it should be

6    consecutive or concurrent, in terms of the -- 50 months is what

7    the New York judge gave.  And the guideline in this particular

8    case is 24 to 30 months.  So even if I gave the 30 months and

9    did it concurrently, he basically is serving a 50-month

10   sentence.  So that certainly factors in to some degree in terms

11   of whether he actually is going to serve the sentence in any

12   meaningful kind of way.  And I do think that these are two

13   separate crimes occurring at different times that involve

14   totally different activities.

15       And from my perspective, I believe that I will be -- I'm

16   going to sentence him to a consecutive sentence.  I think the

17   sentence needs to be considered separately as a separate

18   offense.  The reporting -- I'm assuming the reporting would be

19   the same.  I'm not sure how that works as to whether with a

20   consecutive sentence you have a different reporting or they

21   frankly just -- they calculate the two things together, make a

22   decision about how they're going to work it out.  But I think

23   since you're doing it consecutive, the reporting requirements

24   would be the same, the March 18.  You can double-check on that

25   and make sure that that's not -- that I'm not mistaken about

1     that.

2     So then in terms of coming up with, you know, a just and

3 reasonable sentence here.  Pursuant to the Sentencing Reform Act

4 of 1984, and in consideration of the provisions of 18 U.S.C.

5 3553, as well as the advisory sentencing guidelines, it is the

6 judgment of the Court that you, Charles McGonigal, are hereby

7 committed to the custody of the Bureau of Prisons for a term of

8 28 months on Count 1, to be served consecutively to the sentence

9 imposed in Docket No. 1:23-CR-00016-JHR in the U.S. District

10 Court for the Southern District of New York.

11     You're further sentenced to serve a 36-month, three-year

12 term, of supervised release as to Count 1, to be served

13 consecutively to the sentence in the docket in New York.

14     In addition, you're ordered to pay a special assessment of

15 $100 in accordance with the statute.

16     While on supervision, you shall abide by the following

17 mandatory conditions as well as all discretionary conditions

18 recommended by the probation office in Part D, the sentencing

19 options of the presentence report, which were imposed to

20 establish the basic expectations for your conduct while on

21 supervision.

22     The mandatory conditions include:  You must not commit

23 another federal, state, or local crime.  You must not unlawfully

24 possess a controlled substance.  The drug-testing condition is

25 suspended.  There's no basis to determine that he's any

substance abuse in terms of drugs.  You must cooperate in the collection of DNA as directed by the probation office if you have not already done so.

In terms of the following, I would -- although I have found that there is a financial ability to pay a fine, I am not going to impose a fine, recognizing that he has a sentence of 50 months, 28 months from me, a fine already in the New York case, and although I think he has assets, there is not going to be any income from him coming in during this period of time.  So I will not impose a fine, having done a sentence of incarceration in the amount of time that I have done.

The financial obligations, which from your perspective are really the $100 in my case, are immediately payable to the Clerk of the Court for the U.S. District Court here in D.C.  Within 30 days of any change of address, you'll notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

The probation office shall release the presentence investigation report to all appropriate agencies, which includes the U.S. Probation Office in the approved district of residence, in order to execute the sentence of the Court.  If there are any treatment agencies that are used, they're to return the presentence report to the probation office upon the defendant's completion or termination from treatment.

Now, in terms of the notice of appeal, I frankly am going

to read what was in the plea agreement since it's fairly
complicated.  Mr. McGonigal agreed that -- to waive, insofar
as such waiver is permitted by law, the right to appeal the
conviction on any basis, including but not limited to a claim
that the statute to which you're pleading guilty is
unconstitutional, and the admitted conduct doesn't fall within
the scope of the statute.

There are exceptions, if I had sentenced you above the
statutory maximum, which I did not, or the guideline range,
which I did not.  Now, you still do have the right to -- you did
not waive the right to appeal your conviction and sentence on
the basis of ineffective assistance of counsel, but not to raise
it based on other issues.

At this point they're constitutional and the conduct does
fall within the statute.  If that changes with a higher court,
you obviously can appeal -- enter into a collateral appeal.
You're also agreeing to waive the right to appeal the sentence
in this case, including but not limited to any term of
imprisonment.

I did not impose a fine, forfeiture, or award of
restitution.  But term of condition of supervised release,
authority of the court to set conditions of release, and the
manner in which the sentence was determined.

There are exceptions, if I had sentenced you above the
statutory maximum, which I did not, or the guideline range,
which I did not.  Now, you still do have the right to -- you did
not waive the right to appeal your conviction and sentence on
the basis of ineffective assistance of counsel, but not to raise
it based on other issues.

In terms of the 2255 which is the collateral attack, you
also waived any right to challenge the conviction and sentence

under this agreement, or otherwise attempt to modify or change

the sentence or in which it was determined in any collateral

attack.  And again, this is based on the 2255 final judgments.

The exceptions are a motion based on newly discovered evidence

or a claim that you received ineffective assistance of counsel.

You did reserve the right to a motion under the sentencing

guidelines, so if for some reason at some later point they lower

the guideline range or do something else that's favorable to

you, and it's something that would be retroactive, which isn't

always the case, but you do reserve the right to be able to file

such a motion.  Unfortunately, with the three points, you are

not in a position to take advantage of the new zero points

change in the sentencing guidelines.

Any notice of appeal has to be filed within 14 days of

entry of judgment or within 14 days of the filing of notice of

appeal by the government.  If you can't afford it you can ask to

file it without cost to you, and you can always ask to have

counsel appointed for you.

Now, with the *Hunter* case which came down in 2016 allows me

to question both probation to see if there's something that

needs to be corrected or added or whatever.

PROBATION OFFICER:  Good afternoon, Your Honor.  Aidee

Gavito with the U.S. Probation Office.  Your Honor, with respect

to the term of supervised release, per statute, multiple terms

of supervised release need to run concurrent.  In this case, the

1   36 months ordered in the D.C. case need to run concurrent to the

2   term ordered in New York.

3            THE COURT:  Okay.  I don't see how that's going to

4   happen.  If he has the sentence 50 months, he then goes on

5   supervised release while he's in jail on my sentence.

6            PROBATION OFFICER:  So the supervised release --

7            THE COURT:  Or is the supervised release going to stop

8   after my sentence?

9            PROBATION OFFICER:  The supervised release term will

10  not start in New York until he is --

11           THE COURT:  Released?

12           PROBATION OFFICER:  Until he has served the sentence

13  in the D.C. case.

14           THE COURT:  And I should have asked that question.

15  So he would serve the 50 months, the 28 months, and then go on

16  supervised release.

17           PROBATION OFFICER:  That is correct, Your Honor.

18           THE COURT:  All right.  I don't have a problem.  I was

19  concerned that it wasn't going to work in terms of his having

20  the first sentence.  But I can change it to make it concurrent.

21  I was concerned that there would be a problem in terms of when

22  he would get to serve it if they were going to start the

23  supervised release after his 50 months.  But if they're going to

24  run all of it together.

25       So it's 28 months to be served consecutively as to the

1    New York case, and then the three years or 36 months term of

2    supervised release will be served concurrently with the

3    New York.  So basically he'll serve 36 months of supervised

4    release, period.  Anything else?

5                PROBATION OFFICER:  Yes, Your Honor.  Just for

6    clarification purposes, the Court is granting self-surrender

7    in this case?

8                THE COURT:  Yes.  So he can -- that's my discussion of

9    his being able to report on the March date that he has for the

10   New York case.  So he'd be reporting on the same day for both

11   sentences.

12        Anything else from the government that I need to address?

13                MS. ALOI:  Your Honor, the government just asks at

14   this time that you dismiss Counts 2 through 9 of the indictment.

15                THE COURT:  All right.  I will do so, and I can do

16   that in a written order.  Anything else from counsel?

17        Did you make recommendations as to where he should go?

18                MR. DUCHARME:  That's what I was going to address,

19   Your Honor.  So Judge Rearden --

20                THE COURT:  If you could come up.

21                MR. DUCHARME:  Sure.  Judge Rearden had recommended

22   the RDAP program and therefore a facility in the Northeast that

23   had that program available.  More specifically, the defendant

24   has found the Cumberland, Maryland facility to be one that has

25   RDAP and it's close to some family members.  So we would ask you

1    to join in a recommendation for the RDAP program in the

2    Northeast, and more specifically Cumberland, Maryland, if the

3    BOP can accommodate it.

4            THE COURT:  I think the RDAP program probably should

5    be consistent, and I don't -- in terms of the issues relating to

6    the sentencing and this whole aspect of it, I think the RDAP

7    program in terms of what his issue is, which is not drug use,

8    but his issue I think is appropriate.  So I'll recommend the

9    RDAP program and the BOP facility at Cumberland, Maryland.

10           MR. DUCHARME:  Thank you, Your Honor.

11           THE COURT:  All right.  If there's nothing else, then

12   I'll excuse everybody.

13       I don't expect to see you back here in my courtroom,

14   Mr. McGonigal.  Good luck.  You've obviously turned your life

15   around.  You've got support.  You're young enough to come out of

16   this and move forward.  Do so.  Everybody's excused.

17       (Proceedings adjourned at 4:20 p.m.)

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_/s/ Bryan A. Wayne_
Bryan A. Wayne